602 S.E.2d 768

**Jason ROBERTS, Respondent,**

v.

**STATE of South Carolina, Petitioner.**

No. 25870.

Supreme Court of South Carolina.

Submitted May 13, 2004.

Decided Sept. 13, 2004.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, and Senior Assistant Attorney General William Edgar Salter, III, all of Columbia, for Petitioner.

Assistant Appellate Defender Robert M. Pachak, of Columbia, for Respondent.

Justice WALLER:

Respondent was convicted of murder and sentenced to life imprisonment. Respondent filed an application for post-conviction relief (PCR), which was granted on a number of grounds. This Court granted the State's petition for a writ of certiorari. We hold there is probative evidence to support the PCR judge's decision.

## FACTS

On January 10, 1992, Bobby Marler was found robbed and beaten to death in his pawnshop in Laurens. In early 1993, Thomas E. Whitehead, Jr. gave police a statement about the murder, implicating respondent. From February 1993 to February 1994, Whitehead gave four vastly different statements to police, and was eventually promised by the Sheriff's Department that he would not be charged with murder in return for his testimony.[1]

---

1. None of these statements are included in the record, though it appears some were written and others were recorded, and some were admitted as evidence.

In Whitehead's first statement, which he made on February 26, 1993, Whitehead told police that Jaime McAlister and respondent committed the crime. Whitehead told police that he was not involved. Whitehead claimed respondent told him he and McAlister originally went to Marler's pawnshop to buy marijuana, but that the two ended up robbing and killing Marler. However, McAlister was in jail on the night of the murder, and could not have been involved. Further, Whitehead admitted at trial that police suggested to him that McAlister was involved.

In the second statement, made on November 22, 1993, Whitehead again claimed McAlister and respondent committed the crime. Whitehead told police respondent and McAlister used a baseball bat to beat Marler, and that he saw a silver baseball bat in the hatchback of Matt Cagle's [2] car. Whitehead also claimed respondent used the money from the robbery to buy cocaine. Whitehead admitted at trial that the statement was false.

Whitehead made a third statement on February 8, 1994. In that statement, Whitehead again implicated respondent and McAlister. It appears that shortly after the third statement, police finally discovered McAlister was incarcerated the night of the murder and could not have been involved.

The sheriff's office promised Whitehead that he would not be charged with murder before Whitehead provided the fourth statement in late February 1994.[3] In the fourth statement, Whitehead admitted he was involved, and told police substantially the same story that he told at trial.

Whitehead testified at trial that he, respondent, and Matt Cagle drank beer and liquor at respondent's house and in Cagle's car on the day of the murder. When they needed money to buy more alcohol, the three decided to pawn respondent's .22 rifle. Whitehead testified that while Cagle stayed in the car, he and respondent went into Marler's pawnshop. When Marler opened his wallet to pay for the rifle, he and respondent noticed that Marler had a substantial amount of

---

2. Cagle was another friend of both Whitehead and respondent. Cagle was later charged in connection with the murder.

3. Whitehead testified against respondent in exchange for a five-year sentence. He served three.

money. Whitehead testified that respondent pushed Marler to the floor and beat him in the head and chest with the rifle butt. The two grabbed Marler's wallet and fled. The next day, after spending the night at respondent's house, Whitehead, Cagle, and respondent went to Cagle's house and put the gun in Cagle's father's furnace to melt it down.[4]

During the presentation of respondent's case, respondent's mother testified that he was in night school at the time of the murder, and that she picked him up after school that evening. However, the school did not have any attendance records because respondent was auditing his classes. Respondent's mother also testified that Whitehead and Cagle did not spend the night at her house as Whitehead had claimed in his testimony.

Cagle testified he was not involved in the murder. Cagle testified he went to a birthday party in Greenville on the night of January 9, 1992, and spent the night there because he was too drunk to drive home. Several other witnesses corroborated Cagle's testimony, including Christopher Thornhill, who testified he remembered the date because it was his birthday.

Angela McAlister testified at trial that sometime after the murder, Whitehead visited her son,[5] who was ill. She testified that she stood in the hall and overheard Whitehead tell her son that he should have killed a man named Bob Holmes and that he "[c]ould've gotten away with it because him and his daddy did because of the old fart they murdered ... out in front of the Wal–Mart."[6]

Respondent also presented the testimony of William Anthony Patterson, who stated that he operated the furnace Whitehead claimed was used to melt the gun. Patterson testified that the furnace was not installed until March 1992. Cagle's

---

**4.** The furnace was used to melt aluminum, though it would not melt steel. There was testimony that the wood component of the rifle burned, but the barrel and other steel components of the rifle would not melt. It is unclear what happened to the steel components of the rifle, though there was testimony they were simply "raked out" and left on the ground.

**5.** Angela McAlister is the mother of Jaime McAlister.

**6.** Marler's pawnshop was located across from the Wal–Mart Distribution Center in Laurens.

father corroborated Patterson's testimony, and also added that the furnace did not have a propane tank attached until April 1992. An employee with PNG Propane testified that he installed a propane tank for an aluminum smelter for Cagle's father on March 17, 1992, and that there were no other gas lines in place on that date.

The State also presented testimony from Gary Gleen. Gleen testified at trial that respondent confessed to him while the two were incarcerated at the Broad River Correctional Facility. Gleen described himself as a "paralegal," and testified that he and respondent first discussed the charges in the Monticello Dormitory in Broad River. Gleen testified that respondent initially denied he was involved in the murder.

However, Gleen testified that after the two were transferred to the Saluda Dormitory, respondent discussed the case with him again and admitted he murdered Marler. Gleen testified that he was in cell 106, and that respondent was in another cell, which was *ten feet* away, when the conversations took place. Gleen testified that respondent told him, "Yeah, well, I killed a man but they ain't got nothing on me." Gleen admitted others could overhear the conversations, but claimed he and respondent "would pull ourselves closer so that the voice would only carry towards each other," and that he and respondent simply stopped talking when guards or inmates would pass.

Using notes, Gleen testified that respondent knew Whitehead had given police a statement, but that respondent thought he could "beat the crime" because witnesses would testify he was at school when the murder occurred. Gleen testified that respondent told him he did not have any intention of killing Marler, but that Marler "got smart and acted like he wouldn't take the gun." Gleen testified that respondent showed him how he beat Marler and told him how he melted down the gun after the murder. Gleen further testified that respondent had a "gleam in his eye" when he talked about he murder.

## ISSUE

Did the PCR judge err in finding that counsel was ineffective for failing to present evidence regarding the distance between Gleen and respondent's cells?

. The State contends the PCR judge erred in finding that counsel was ineffective for failing to present evidence that respondent's conversations with Gleen were impossible. We disagree.

The burden is on the applicant in a post-conviction proceeding to prove the allegations in his application. *Butler v. State,* 286 S.C. 441, 442, 334 S.E.2d 813, 814 (1985). In order to establish a claim of ineffective assistance of trial counsel, a PCR applicant must prove that: (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the applicant's case. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Cherry v. State,* 300 S.C. 115, 117, 386 S.E.2d 624, 625 (1989). To show that counsel was deficient, the applicant must establish that counsel failed to render reasonably effective assistance under prevailing professional norms. *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. To show prejudice, the applicant must show that, but for counsel's errors, there is a reasonable probability the result of the trial would have been different. *Johnson v. State,* 325 S.C. 182, 186, 480 S.E.2d 733, 735 (1997). A reasonable probability is a probability sufficient to undermine confidence in the outcome of trial. *Id.* at 186, 480 S.E.2d at 735.

This Court gives great deference to the PCR judge's findings when matters of credibility are involved. *Drayton v. Evatt,* 312 S.C. 4, 13, 430 S.E.2d 517, 522 (1993). The existence in the record of any evidence of probative value is sufficient to uphold the PCR judge's ruling. *Caprood v. State,* 338 S.C. 103, 109–10, 525 S.E.2d 514, 517 (2000).

At the PCR hearing, respondent testified that he and Gleen were both inmates in Saluda Dormitory at the Broad River Correctional Facility. Respondent admitted that he talked to Gleen about the case. However, respondent maintained that he told Gleen he did not commit the crime. Respondent testified that it was impossible for the conversation to have taken place as Gleen maintained, and that the distance between the cells was approximately thirty-five feet, not ten feet. Respondent further testified that there were seventy inmates in Saluda Dormitory when he was incarcerated there. Respondent then presented a videotape of the prison dormitory

to show the noise level in the dormitory and the distance between the cells.[7]

Ricky Higgs testified at the PCR hearing that he and respondent were next door to each other in segregated lockup in Saluda Dormitory. Higgs stated that respondent's cell was approximately thirty-five feet from Gleen's cell, and that the noise in Saluda was "deafening" at times. Higgs testified that, while it was possible to have a conversation with someone in the next cell because of shared ventilation systems, one would have to yell to be heard by someone in another cell. Higgs testified that he heard respondent and Gleen yelling across the breezeway about respondent's case. However, Higgs stated that respondent never confessed to Gleen.

Trial counsel testified that Gleen was not listed as a witness in the initial discovery response and that he was not aware Gleen would testify until a short time before the trial. Trial counsel remembered discussing with respondent that it was physically impossible to have the discussion Gleen described because of the layout of Saluda Dormitory. However, counsel did not cross-examine Gleen about the configuration of the cells, and he failed to present any evidence about the setup of Saluda Dormitory.

The PCR judge found that the videotape showed respondent's cell was one hundred feet away from Gleen's, and it was therefore impossible for the conversation to have taken place as Gleen alleged. The PCR judge found that if this evidence had been presented at trial, it would have had a significant impact on the credibility of Gleen, who was a key witness for the State. The PCR judge also ruled that the evidence would have been available at trial if trial counsel had made diligent efforts to obtain it. Finally, the PCR judge found there was a reasonable probability the result at trial would have been different had trial counsel presented the evidence to the jury.

 Even conceding that respondent engaged in some conversations with Gleen, it is highly unlikely that respondent confessed to murder across a cellblock from a distance of thirty-five to one hundred feet. There was evidence at the

---

7. Unfortunately, the videotape is defective and the Court has been unable to view it.

PCR hearing that numerous other inmates and guards would have overheard respondent, as it would have been necessary to shout over the television and other noise. Additionally, counsel admitted that he was somewhat unprepared for Gleen's testimony, and counsel failed to refute Gleen's assertion that the cells were no more than ten feet apart at trial. *See Davis v. State,* 326 S.C. 283, 288, 486 S.E.2d 747, 749 (1997) (evidence supported PCR judge's ruling that counsel was deficient, in part because counsel admitted he was unprepared for trial).

While we acknowledge that this is a close case, there is at least some probative evidence to support the PCR judge's ruling. We agree with the PCR judge's finding that, had counsel presented evidence that the jail cells were more than a mere ten feet apart, there is a reasonable probability the result at trial would have been different. This evidence was particularly important in light of the fact that the case against respondent was far from overwhelming, and consisted almost entirely of the testimony of Whitehead, a codefendant who implicated an innocent man in three false statements, and Gleen, a jailhouse snitch. Additionally, we note that there was evidence presented at trial and at PCR that Whitehead told several people that he and his father committed the crime and that respondent was not involved. Further, the jury returned during deliberations and actually asked the trial judge "who was on trial" in the case.[8] The trial judge simply told the jury that respondent was on trial.[9]

Accordingly, we hold there is probative evidence to support the PCR judge's finding that counsel was deficient for failing to present evidence of the cell configuration. *See Caprood,* at 109–10, 525 S.E.2d at 517; *Webb v. State,* 281 S.C. 237, 238, 314 S.E.2d 839, 839 (1984).

---

8. The jury actually asked two questions, neither of which is included in the record. The parties have been unable to locate the exhibits.

9. We also note that the PCR judge found trial counsel was ineffective for failing to move for a mistrial when the jury returned with this question. The State seeks reversal on this issue; however, because we hold that the PCR judge correctly granted relief on the question of Gleen's testimony, we need not address whether the PCR judge erred in ruling counsel was ineffective for failing to move for a mistrial following the jury question.

## CONCLUSION

We affirm the PCR judge's ruling that counsel was ineffective for failing to present evidence regarding the configuration of the cells. Accordingly, we need not address the State's remaining questions. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (holding that an appellate court need not address all remaining issues when disposition of prior issue is dispositive).

**AFFIRMED.**

TOAL, C.J., MOORE, BURNETT and PLEICONES, JJ., concur.