Melvin Lee **PARRISH**, Appellant,

v.

**COMMONWEALTH** of Kentucky, Appellee.

No. 2006–SC–000592–MR.

Supreme Court of Kentucky.

Sept. 18, 2008.

Rehearing Denied Jan. 22, 2009.

Brian Thomas Ruff, Dennis James Burke, Assistant Public Advocates, Department of Public Advocacy, LaGrange, KY, Counsel for Appellant.

Jack Conway, Attorney General, Louis Franklin Mathias, Jr., Office of the Attorney General, Assistant Attorney General, Criminal Appellate Division, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice NOBLE.

Appellant, Melvin Lee Parrish, was convicted of multiple murders, attempted murder, and robbery, and was sentenced to death in 2000. The current appeal stems from a post-conviction collateral attack on his sentence under RCr 11.42 in which he alleges that his death sentence is unconstitutional and that he received ineffective assistance of counsel during his murder trial. The circuit court denied the motion and upheld Appellant's sentence. This Court affirms.

## I. Background

At trial, evidence was introduced that Parrish and others had spent the day of the murders smoking crack cocaine. The evidence indicated that Appellant loaned his cousin Rhonda money that day and later asked for it back. When she refused, he stabbed her multiple times and took the money. Appellant then went to a back bedroom where he assaulted his cousin's two sons. One child survived and was able to testify that Parrish had attacked him and his brother. In a taped statement made to police the morning after the murders, Appellant denied attacking the children but admitted that he stabbed his cousin, stating, "I asked her twice [to borrow back the money] and she said no and I guess I killed her." The Commonwealth also introduced evidence from a jailhouse informant who testified that he was incarcerated with Appellant and that Appellant had told him that he had committed the murders and intended to avoid conviction by faking insanity.

Appellant was found guilty of two counts of intentional murder, one count of attempted murder, and one count of robbery. During the penalty phase, the jury found as an aggravating factor that the crimes were committed in the course of a robbery and sentenced Appellant to death for the murder of the child, life without parole for the murder of his cousin, 20

years enhanced to life for the attempted murder, and 20 years enhanced to 50 years for robbery. Appellant's conviction and sentence were affirmed on direct appeal to this Court in *Parrish v. Commonwealth,* 121 S.W.3d 198 (Ky.2003).

Appellant filed his RCr 11.42 motion with the Jefferson Circuit Court on March 4, 2005. In it, he alleged that he was mentally retarded and therefore his death sentence violated the Eighth Amendment, and that he had at least presented enough evidence to require a new sentencing hearing; that he received ineffective assistance of counsel during the guilt phase and penalty phase of his trial; that his death sentence violated international treaties; and that cumulative error required vacating his sentence. The circuit court declined to hold an evidentiary hearing and entered a 23–page Opinion and Order denying Appellant's RCr 11.42 motion.

Appellant appeals to this Court as a matter of right. Ky. Const. § 110(2)(b). He now claims that the circuit court[1] erred in not conducting an evidentiary hearing, in its conclusions about ineffective assistance of counsel, and in its resolution of the various other legal issues he raised.

## II. Analysis

### A. Evidentiary Hearing

■ Appellant's first claim of error is that the circuit court improperly refused to hold an evidentiary hearing to resolve the factual disputes raised by his RCr 11.42 motion. It must first be said that "[e]ven in a capital case, an RCr 11.42 movant is not automatically entitled to an evidentiary hearing." *Stanford v. Commonwealth,* 854 S.W.2d 742, 743 (Ky.1993).

■ Whether an RCr 11.42 movant is entitled to an evidentiary hearing is determined under a two-part test. First, the movant must show that the "alleged error is such that the movant is entitled to relief under the rule." *Hodge v. Commonwealth,* 68 S.W.3d 338, 342 (Ky.2001). In other words, the court must assume that the factual allegations in the motion are true, then determine whether there " 'has been a violation of a constitutional right, a lack of jurisdiction, or such a violation of a statute as to make the judgment void and therefore subject to collateral attack.' " *Id.* (quoting *Lay v. Commonwealth,* 506 S.W.2d 507, 508 (Ky.1974)). "If that answer is yes, then an evidentiary hearing on a defendant's RCr 11.42 motion on that issue is only required when the motion raises 'an issue of fact that cannot be determined on the face of the record.' " *Id.* (quoting *Stanford v. Commonwealth,* 854 S.W.2d 742, 743–44 (Ky.1993)). To do this, the court must "examin[e] whether the record refuted the allegations raised" (and not "whether the record supported the allegations, which is the incorrect test"). *Id.* This two-part test is consistent with those cases cited in Appellant's brief. *See Norton v. Commonwealth,* 63 S.W.3d 175 (Ky.2001); *Fraser v. Commonwealth,* 59 S.W.3d 448 (Ky.2001).

Appellant argues that throughout his RCr 11.42 motion, which included a 43–item appendix, he alleged sufficient facts that both supported his claims of constitutional deprivations and could not be determined on the face of the record. Though Appellant styles this claim as a separate argument, implying that it is independent from his specific substantive claims, it is conceptually difficult to address it sepa-

---

1. References to the "circuit court" should be read to refer to the Jefferson Circuit Court when it ruled on Appellant's RCr 11.42 motions. References to the "trial court" should be read to refer to the Jefferson Circuit Court as it acted up to and including Appellant's trial for murder.

rately in an Opinion by this Court and would require duplicative effort. Thus, whether Appellant is entitled to an evidentiary hearing accompanies the Court's analysis of the other claims below.

## B. The Constitutional Ban on Executing Mentally Retarded Defendants

Appellant claims that he is mentally retarded and therefore is not subject to the death penalty under the Eighth Amendment pursuant to *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). Notably, Appellant does not raise this as an issue of ineffective assistance of counsel; rather, he argues the issue of his alleged mental retardation directly as a bar on his receiving the death penalty.

Appellant's trial counsel had moved in October 2000 to have the trial court determine whether Appellant was mentally retarded and therefore not subject to the death penalty pursuant to KRS 532.130–.140, the statutory mechanism for applying *Atkins* in Kentucky. Appellant had been previously evaluated by a defense expert in this area: Robert Smith, Ph.D., who was retained by Appellant's original counsel. He reviewed Appellant's records, interviewed and tested Appellant. (The record does not include the results of Dr. Smith's examinations, nor why Appellant changed counsel at trial.) Leading up to a hearing on the motion, Appellant was examined and tested by Dr. Stephen Free, a psychologist at Kentucky Correctional Psychiatric Center (KCPC), who later testified that Appellant's IQ was 79 and that a previous IQ score of 68 from when Appellant was fifteen was the result of a lack of motivation. The proceedings and results of the KCPC examination were reviewed by another psychologist, Eric Drogin, Ph. D., who was retained by Appellant's final trial lawyers. Though Dr. Drogin did not testify with regard to the mental-retardation motion, he did testify during the penalty phase that the tests administered by Dr. Free were "properly administered and scored." The trial court held a hearing on the matter where Dr. Free testified about his result and conclusion that Appellant was not mentally retarded under KRS 532.130–.140. At the hearing, the court received additional evidence of Appellant's school test scores. On November 16, 2000, the trial court ruled that Appellant was not mentally retarded and was therefore not exempt from the death penalty.

■ To begin with, this claim is not an appropriate one for an RCr 11.42 proceeding. If Appellant wanted to challenge the substance of the trial court's ruling on this issue, he should have done so in his direct appeal, not by means of an RCr 11.42 motion. "It is not the purpose of RCr 11.42 to permit a convicted defendant to retry issues which could and should have been raised in the original proceeding, nor those that were raised in the trial court and upon an appeal considered by this court." *Thacker v. Commonwealth,* 476 S.W.2d 838, 839 (Ky.1972); *see also Mills v. Commonwealth,* 170 S.W.3d 310, 326 (Ky.2005) ("[A]n RCr 11.42 motion is limited to issues that were not and *could not* be raised on direct appeal." (emphasis added)). Though he did not then have the benefit of *Atkins,* Kentucky already had in place a statutory mechanism for dealing with mentally retarded individuals facing the death penalty and Appellant took full advantage of that mechanism. Though Appellant did not raise this issue in his direct appeal, he easily could have. An RCr 11.42 motion simply is not an appropriate vehicle to raise it. While the circuit court revisited the mental retardation evidence in its order denying the RCr 11.42 motion, it was unnecessary to do so be-

cause the issue had already been addressed prior to the trial.

Regardless, Appellant's claim is clearly refuted by the record. As noted by the circuit court in its order prior to Appellant's trial and in its order denying the RCr 11.42 motion, substantial evidence indicated that Appellant's IQ was at least 70, which is the cut-off for mental retardation recognized in *Atkins* and required by Kentucky's statutory scheme. Ample evidence supported the trial court's ruling. That the record also contains an IQ score for Appellant of 68 from when he was younger (explained by an expert as the result of lack of motivation) does not allow this Court to overturn the factual findings by the trial court on this issue. Appellant also cites to evidence of "substantial deficits in adaptive behavior," which are also required by KRS 532.130(2), but ignores the statute's requirement that these must coexist with an IQ of 70 or below.

Appellant also claims that the mental retardation statutory framework, KRS 532.130–.140, employs a definition of "mental retardation" that is at odds with the requirements of *Atkins*. In *Atkins,* the Supreme Court specifically left the method for defining and identifying mentally retarded offenders to the states. *See Atkins,* 536 U.S. at 317, 122 S.Ct. at 2250. This Court has identified and approved KRS 532.130–.140 as the means by which *Atkins* would be applied in Kentucky, and has held the statutory scheme to be constitutional under *Atkins*. *Bowling v. Commonwealth,* 163 S.W.3d 361, 374–76 (Ky. 2005). Appellant asks this Court to overturn *Bowling's* approval of the statutory framework; this Court declines the invitation to do so.

### C. Ineffective Assistance of Counsel

Most of Appellant's claims are based on a broader claim that his trial lawyers were ineffective at trial. As noted above, for an evidentiary hearing to be required, the RCr 11.42 motion must show entitlement to relief (for example, a constitutional violation) and raise an issue of fact that is not refuted by the record. Ineffective assistance of counsel is such a claim of a constitutional violation. *McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 1449 n. 14, 25 L.Ed.2d 763 (1970) ("It has long been recognized that the right to counsel is the right to the effective assistance of counsel.").

■ Ineffective assistance of counsel is evaluated under the standard established in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), adopted by this Court in *Gall v. Commonwealth,* 702 S.W.2d 37 (Ky.1985). *Strickland* first requires that Appellant "must show that counsel's performance was deficient." 466 U.S. at 687, 104 S.Ct at 2064. This is done by "showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," *id.,* or "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. at 2064. In applying the *Strickland* test, the Court noted, "Judicial scrutiny of counsel's performance must be highly deferential.... [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, 104 S.Ct. at 2065. Appellant is not guaranteed errorless counsel or counsel that can be judged ineffective only by hindsight, but rather counsel rendering reasonably effective assistance at the time of trial. *Id.; see also Haight v. Commonwealth,* 41 S.W.3d 436, 442 (Ky.2001).

Next, Appellant "must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland,* 466 U.S. at 687, 104 S.Ct at 2064. Or, as noted later in *Strickland,* "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068. A reviewing court must consider the totality of the evidence before the jury and assess the overall performance of counsel throughout the case to determine whether the specifically complained-of acts or omissions are prejudicial and overcome the presumption that counsel rendered reasonable professional assistance. *Id.* at 695, 104 S.Ct. at 2069; *see also Foley v. Commonwealth,* 17 S.W.3d 878, 884 (Ky.2000).

Finally, "[u]nless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064.

It is within this framework that Appellant's specific claims of ineffective assistance must be evaluated.

### 1. Intellectual Capacity Mitigation

#### a. Evidence of Diminished Intellectual Capacity

Appellant claims that his trial lawyers were ineffective because they failed to present mitigation evidence of his diminished intellectual capacity, which he claims borders on mental retardation, during the penalty phase of his trial.[2] Specifically, he claims that the evidence at trial showed only that he was a poor student with diminished verbal skills, but that other evidence existed to show that his low intellectual capacity had an impact on many areas of his life and that he had a history of problems in adapting to home-life and the workplace. Appellant admits that there was some testimony in this regard but claims that "other witnesses who were available to offer mitigation testimony in this area were either never located or never presented at trial" and that an expert witness was necessary to rebut the Commonwealth's claims that he was fully functional. Finally, he argues that the evidence of his crack cocaine use should have been introduced because it would have shown further diminished capacity.

As this Court has stated, " An attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence.' " *Hodge v. Commonwealth,* 68 S.W.3d 338, 344 (Ky. 2001) (quoting *Porter v. Singletary,* 14 F.3d 554, 557 (11th Cir.1994)). However, "[a] reasonable investigation is not an investigation that the best criminal defense lawyer in the world, blessed not only with unlimited time and resources, but also with the benefit of hindsight, would conduct. The investigation must be reasonable under all the circumstances." *Haight v. Commonwealth,* 41 S.W.3d 436, 446 (Ky. 2001) (citations omitted). Appellant relies

**2.** This allegation is limited only to evidence of mental retardation or other diminished mental capacity that might have been used as mitigation evidence. As discussed above, Appellant does not allege ineffective assistance of counsel with regard to his claim that he is mentally retarded and therefore exempt from the death penalty.

heavily on *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), wherein the Court held that an unreasonable investigation into and presentation of mitigation evidence was ineffective assistance of counsel.

As noted by the circuit court in denying Appellant's motion, "A review of the witnesses called by the defense in the penalty phase reveals one unassailable fact: Parrish's counsel attempted to paint a realistic and complete picture of Parrish as seen by family, friends, teachers, and mental health experts." The court then noted that in addition to witnesses who testified about Appellant's history and background and spiritual interests, Appellant's lawyers called several witnesses who testified specifically about his intellectual capacity—or at least about facts related to his capacity—including his mother, who testified about his early years, described a head injury when he was 5 years old, and noted that he had held only fast food and factory jobs; the Oldham County Director of Special Education, who "testified at length" about Appellant's time at Oldham County High School, including his "IQ and reading test scores, as well as his performance in classes for the educationally mentally handicapped"; a psychiatrist from KCPC, who had examined Appellant and who testified that Appellant had a low IQ and discussed the "difficulties encountered by individuals with low IQ's"; and a defense expert witness, a licensed psychologist, who reviewed the KCPC psychiatrist's data (confirming that the test had been administered properly) and testified that Appellant "suffered from a learning disability as evidenced by" a disparity in Appellant's scores on different parts of the KCPC-administered IQ test. The court noted that multiple psychologists had been retained to assist in Appellant's defense and concluded that his lawyers could not

have erred by not putting forth evidence that did not exist.

Also, as discussed above, Appellant's lawyers raised the issue of Appellant's diminished intellectual capacity in a pre-trial motion to exclude the death penalty on the grounds that Appellant was mentally retarded. This motion was based on investigation into Appellant's intellectual capacity by his own expert and the KCPC expert, and resulted in a hearing followed by written findings on the issue by the trial court.

Unlike the case in *Hodge*, where it appeared that defense counsel conducted no investigation into mitigation, 68 S.W.3d at 344, or in *Wiggins*, where the defense counsel conducted a limited investigation and put on a "half-hearted" mitigation case, 539 U.S. at 526–28, 123 S.Ct. at 2537–39, it is clear from this record that Appellant's lawyers conducted a serious investigation into Appellant's intellectual capacity prior to trial. His lawyers also aggressively litigated the issue, both prior to the trial and during the sentencing phase. That the lawyers' approach to this evidence may have been imperfect, or that they did not track down every possible expert or piece of evidence available, does not render their assistance ineffective.

The record reveals that Appellant's lawyers conducted a reasonable investigation into his intellectual capacity and introduced sufficient evidence of that limited capacity in mitigation during the penalty phase to satisfy the Sixth Amendment's requirement of reasonably effective counsel. Appellant was not entitled to an evidentiary hearing on this issue, and he is not entitled to relief from this Court.

As for the evidence of Appellant's cocaine use on his intellectual capacity, the circuit court was correct in noting that "an RCr 11.42 motion is not an exercise in second-guessing counsel's trial strategy." While such an approach may have been

successful in the hands of a Clarence Darrow or F. Lee Bailey, the decision to focus on Appellant's history, spiritual interests, and non-drug-induced mental limitations was certainly reasonable, especially in light of the fact that Appellant's drug use was self-induced, illegal behavior, and that it was posited as part of his motive for the murders. This type of speculative reaching in the collateral attack context is the precise reason courts apply a strong presumption of trial counsel's reasonableness—it sets a minimum bar for an argument to withstand scrutiny below which a court need not engage in extended discussion and analysis. Appellant's cocaine-binging argument is below that bar and does not withstand scrutiny.

## b. Adequacy of the Jury Instructions

Appellant also claims that his trial counsel was ineffective with regard to the jury instructions in two ways.

### i. Mitigation Instruction.

██ Appellant first claims his counsel was ineffective for failing to challenge or offer an alternative to the following jury instruction on mitigation:

In fixing the sentence for the Defendant, Melvin Parrish, for each of the offenses of Murder, you shall consider such mitigating or extenuating facts and circumstances as have been presented to you in the evidence and you believe to be true, including but not limited to such of the following that you believe from the evidence to be true:

(1) The offense was committed while the Defendant was under the influence of extreme mental or emotional disturbance even though the influence of extreme mental or emotional disturbance was not sufficient to constitute a defense to the crime.

(2) At the time of the offense, the capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of retardation or intoxication, even though the impairment of capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirement of the law was insufficient to constitute a defense to the crime.

(3) Any other circumstance or circumstances arising from the evidence which you, the Jury, deem to have mitigating value.

In addition to the foregoing, you shall consider those aspects of the Defendant's character, and those facts and circumstances of the particular offense of which you have found him guilty, about which he has offered evidence in mitigation of the penalty to be imposed upon him and which you believe from the evidence to be true.

Specifically, Appellant claims that the use of the adjective "other" in part (3) along with the linking of Appellant's alleged mental retardation with his ability to appreciate the criminality of his conduct in part (2) limited the use of mental retardation as a mitigating factor to the circumstance described in part (2). He argues that this impermissibly limited the jury's consideration of his mental and intellectual limitations as mitigating evidence.

██ Because this ineffective assistance of counsel claim depends on the instruction being in error, that issue must be examined first. As the U.S. Supreme Court has noted,

[T]he proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant

evidence. Although a defendant need not establish that the jury was more likely than not to have been impermissibly inhibited by the instruction, a capital sentencing proceeding is not inconsistent with the Eighth Amendment if there is only a possibility of such an inhibition. This "reasonable likelihood" standard, we think, better accommodates the concerns of finality and accuracy than does a standard which makes the inquiry dependent on how a single hypothetical "reasonable" juror could or might have interpreted the instruction. There is, of course, a strong policy in favor of accurate determination of the appropriate sentence in a capital case, but there is an equally strong policy against retrials years after the first trial where the claimed error amounts to no more than speculation. Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

*Boyde v. California,* 494 U.S. 370, 380–81, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990).

In light of this standard, it is clear that the circuit court was correct in ruling that the instructions did not improperly limit the jury. The introductory portion of the instruction mandated that the jurors consider all mitigating facts or circumstances that they believed to be true. The instruction then went on to list *examples* of mitigating factors, with parts (2) and (3) of the instruction as part of that list, which was not exclusive of other factors. It is also worth noting that part (2) of the instruction limited the linkage between mental retardation and the ability of Appellant to appreciate the criminality of his conduct when the offense was committed. As the circuit judge noted, "A common-sense reading of [part (2)] establishes that one form of mitigation was evidence of mental retardation or intoxication which would impair the Defendant's capacity at the time of the offense. However, the jury was not precluded from considering mental retardation or low level intellectual functioning in general to the extent such evidence has mitigating value in the eyes of the jury."

Since this Court concludes that the instruction was not erroneous, there could not have been ineffective assistance of counsel in failing to challenge the instruction.

## ii. Unanimity Instruction

■ Appellant claims his counsel was ineffective for failing to challenge or offer an alternative to the jury instruction requiring that the jury's penalty verdict be unanimous, which he claims also improperly required the jury to be unanimous in considering any mitigating evidence or factor. The instruction in question, which appeared at the end of the instructions, read: "The verdict of the jury must be in writing, must be unanimous, and must be signed by one of you as Foreperson." Specifically, Appellant relies on *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), and *McKoy v. North Carolina,* 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990), which held that a state may not require unanimity in the jury's finding on mitigation.

Again, because this ineffective assistance of counsel claim depends on the instruction being in error, that issue must be examined first. The unanimity instruction here specifically referred only to the verdict, not the jury's consideration of mitigating

factors, and was a separate instruction from that on mitigation. Appellant's argument has previously been rejected by this Court on multiple occasions. *See Soto v. Commonwealth,* 139 S.W.3d 827, 871 (Ky. 2004) ("The unanimity instruction specifically referred to each verdict. It did not instruct the jury that its finding must be unanimous or that it must reach a verdict on mitigating circumstances."); *Haight v. Commonwealth,* 938 S.W.2d 243, 249 (Ky. 1996) (denying a similar unanimous verdict claim); *Bowling v. Commonwealth,* 873 S.W.2d 175, 180 (Ky.1993) (specifically distinguishing instructions like those used in Kentucky from *Mills v. Maryland*). Despite their obvious bearing on this case, none of these precedents were cited in Appellant's brief.

Nevertheless, there being no sound reason to depart from these precedents, this Court must conclude that the unanimity instruction was proper, and that there was no improper limit on the jury's consideration of mitigation evidence. Appellant's trial lawyers were thus not ineffective in this regard.

### iii. Effectiveness of Appellate Counsel

Appellant also claims that appellate counsel on his direct appeal was ineffective for having failed to raise these instructions issues. Appellant relies on *Evitts v. Lucey,* 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985), and *Smith v. Robbins,* 528 U.S. 259, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000), for this claim. While this Court has declared that "ineffective assistance of appellate counsel is not a cognizable issue in this jurisdiction," *Lewis v. Commonwealth,* 42 S.W.3d 605, 614 (Ky.2001), both *Evitts* and *Smith* seem to recognize a right to effective counsel on the initial appeal. However, those cases involved situations where the appellate counsel filed no merits brief at all, with one missing a filing deadline,

resulting in dismissal of the appeal, and one incorrectly claiming that any appeal would be frivolous under *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967).

That is not the situation in this case. A merits brief was filed in this case and this Court issued an Opinion addressing Appellant's dozen claims raised therein. We have rejected such ineffective assistance of counsel claims on multiple occasions, distinguishing those situations in which a merit s brief is filed (as in this case) from those in which no brief is filed (as in *Evitts* and *Smith*). *See Hicks v. Commonwealth,* 825 S.W.2d 280, 281 (Ky.1992) ("We think there is a substantial difference in the situation of a convicted defendant for whom no appeal was even taken or one whose appeal was dismissed solely due to neglect of counsel and the situation of a defendant whose appeal was completely processed and the judgment affirmed. In the first case, there was never any consideration of the merit s of any substantive issue by the appellate court. In the latter case, the appellate court has considered and decided the merits of the appeal. We will not examine anew an appeal reviewed, considered and decided by this Court."); *Harper v. Commonwealth,* 978 S.W.2d 311, 318 (Ky.1998) (applying *Hicks*). That Appellant's counsel on his direct appeal did not raise every issue that his current attorneys would have does not mean their assistance was ineffective, especially since those issues were, as noted above, without merit.

Curiously, though these cases are directly on point, Appellant's current counsel has for some reason declined or failed to cite them. While this Court does not find that the failure was intentional or an attempt to mislead the Court as to the applicable law, it would simply direct counsel to SCR 3.130–3.3(a)(1), which bars a lawyer from knowingly making a false statement of the

law, which includes a failure to cite pertinent authority. *See* SCR 3.130–3.3 cmt. 3 ("Legal argument based on a knowingly false representation of law constitutes dishonesty toward the tribunal. A lawyer is not required to make a disinterested exposition of the law, but must recognize the existence of pertinent legal authorities.").

## 2. Future Dangerousness Mitigation Evidence

 Appellant argues that his trial lawyers were ineffective because they failed to introduce mitigation evidence about his lack of future dangerousness in prison. Specifically, he claims that they failed to ask for a continuance or to introduce the report of an expert witness about future dangerousness and failed to sufficiently investigate and find a guard who had worked at the jail where Appellant was incarcerated while waiting for trial. The expert witness at issue was a psychologist with expertise in an actuarial approach to determining future dangerousness in prison. He was unable to attend the trial because of a last-minute illness. Appellant's trial lawyers did not seek a continuance so the expert could testify at a later time, nor did they seek to introduce the expert's report in his absence. The jail guard was found in an investigation by Appellant's post-conviction counsel. In an interview, the guard stated that Appellant was "a regular guy, easy going" and that he "never had any trouble with" Appellant. Appellant claims both witnesses would have provided mitigation testimony to which he was constitutionally entitled, thus making his trial lawyers' performance constitutionally ineffective.

 This Court begins by noting that " 'the Eighth and Fourteenth Amendments require that the sentencer … not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's charac-

ter or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.' " *Eddings v. Oklahoma,* 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982) (quoting *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978)). Further, "[j]ust as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law,* any relevant mitigating evidence." *Id.* at 114, 102 S.Ct. at 877.

These principles have specifically been applied to the type of evidence Appellant claims his lawyers should have introduced at trial: "evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating. Under *Eddings,* such evidence may not be excluded from the sentencer's consideration." *Skipper v. South Carolina,* 476 U.S. 1, 5, 106 S.Ct. 1669, 1671, 90 L.Ed.2d 1 (1986). Thus, evidence regarding a defendant's future dangerousness is frequently called "*Skipper* evidence."

The Commonwealth argues that *Skipper* is distinguishable because the prosecution in this case did not focus on Appellant's future dangerousness, whereas such focus was a major aspect of the proof in *Skipper.* This, however, is a misreading of *Skipper,* which noted that general mitigation evidence of future dangerousness implicated the Eighth Amendment, but that such evidence also implicated Due Process when the prosecution specifically alleged that the defendant would be dangerous in the future. *See id.* at 5 n. 1, 106 S.Ct. at 1671 n. 1 ("The relevance of evidence of probable future conduct in prison as a factor in aggravation or mitigation of an offense is underscored in this particular case by the prosecutor's closing argument, which urged the jury to return a sentence of

death in part because petitioner could not be trusted to behave if he were simply returned to prison. Where the prosecution specifically relies on a prediction of future dangerousness in asking for the death penalty, it is not only the rule of *Lockett* and *Eddings* that requires that the defendant be afforded an opportunity to introduce evidence on this point; it is also the elemental due process requirement that a defendant not be sentenced to death 'on the basis of information which he had no opportunity to deny or explain.' ") (quoting *Gardner v. Florida,* 430 U.S. 349, 362, 97 S.Ct. 1197, 1207, 51 L.Ed.2d 393 (1977)). Rather than being a factual limit on the application of *Skipper,* the prosecution's reliance on evidence of a defendant's future conduct simply elevates the constitutional importance of such evidence.

That said, this Court concludes the circuit court did not err in finding that Appellant's trial lawyers provided constitutionally sufficient assistance in this area. As noted by the circuit court, Appellant's trial attorneys did introduce some evidence related to Appellant's possible future dangerousness in the form of testimony of the jail chaplain, a lay Catholic minister. The chaplain testified that he had known Appellant for the entire period of his incarceration (approximately three years), that he had had regular interactions with Appellant, and that Appellant had been involved in a Bible study group and was a leader whom other inmates looked up to. The circuit court noted, "While this particular evidence did not relate to Parrish's absence of disciplinary problems, it was quite clear that Parrish was 'behaving himself in the institution.' " Introduction of this evidence does not necessarily mean that a reasonable attorney would not have sought to introduce other evidence related to future dangerousness, especially after having retained an expert on the subject. In fact, this is perhaps the most troubling

issue that Appellant has raised. However, effectiveness of counsel is not lacking just because Appellant's lawyers chose not to introduce all possible evidence relating to this issue. Given the chaplain's testimony and the need to consider whether a continuance to obtain the retained expert's testimony would be more beneficial than avoiding further delay, Appellant's trial lawyers were forced to make a strategic decision of the moment, not as a matter of hindsight.

Consequently, this Court concludes that the chaplain's testimony undercuts any prejudice that Appellant can claim here since it was sufficient to put the mitigation factor of future dangerousness before the jury. Perhaps the result would be different if the prosecution had claimed Appellant would pose a danger in the future, but that is not the case here. As this trial actually proceeded, the only evidence relating Appellant's future dangerousness went in his favor. Appellant has not alleged sufficient facts to demonstrate the prejudice required by the second prong of the *Strickland* test and an evidentiary hearing on this issue was unnecessary.

### 3. Suppression of Appellant's Confession

Appellant spends several pages articulating why his confession appeared to be inconsistent with the physical evidence, thus concluding that it must have been false. He claims that he is "low functioning" and that the police interrogated him multiple times to support this claim. He states, "Despite the fact that a key part of the 'confession' was inconsistent with the physical evidence, the Commonwealth nevertheless used it in its efforts to kill Parrish." Appellant then goes on to argue that his waiver of his *Miranda* rights was not knowing and intelligent. In making this argument, he notes that persons with diminished capacity are more likely to be

subject to police manipulation, which undercuts the knowing and intelligent waiver requirement.

■ To the extent that these arguments are an attempt to appeal the trial court's decision not to suppress the confession, this Court declines to address them. The issue was litigated prior to Appellant's trial and was an appropriate issue on direct appeal. *See Thacker*, 476 S.W.2d at 839 ("It is not the purpose of RCr 11.42 to permit a convicted defendant to retry issues which could and should have been raised in the original proceeding ....."); *see also Mills*, 170 S.W.3d at 326 ("[A]n RCr 11.42 motion is limited to issues that were not and *could not* be raised on direct appeal." (emphasis added)). Though Appellant did not raise this issue in his direct appeal, he could have; thus he is barred from raising it in an RCr 11.42 motion.

■ However, Appellant also claims that his trial lawyers were ineffective in dealing with the suppression issue because they did not adequately investigate or introduce sufficient evidence of Appellant's mental deficiencies at the suppression hearing, which he claims could have led to a finding that his confession was not knowing and voluntary.

Appellant's intellectual capacity was raised to some extent during the suppression hearing. During cross-examination of the police detective who had questioned Appellant, in the course of discussing a line of questioning related to Appellant's mental state during the interview, the trial judge noted that she needed to know things like whether Appellant had been severely intoxicated, was able to read, and what his IQ was in order to make a responsible decision about the voluntariness of his confession. Following this discussion, one of Appellant's lawyers asked the detective whether Appellant had appeared to be under the influence of drugs, to

which he replied in the negative. The lawyer and detective then engaged in the following exchange:

> Lawyer: Do you have any opinion as to Mr. Parrish's intelligence at the time he was giving the statement? Above average? Average? Below average?
>
> Detective: According to him, he could read, he could write, he could talk. That's average to me.
>
> Lawyer: Average intelligence?
>
> Detective: If he could read and write, yes.

At the end of the hearing, the trial judge found that no evidence had been presented that Appellant did not understand the waiver of rights form. On the issue of voluntariness, she stated:

> Mr. Parrish was at the time of this interrogation a 34–year–old man. There is no evidence that he is of sub-normal mentality of any type. His intelligence level appeared to the detective to be average. He indicated to them that he could read and write, and there was nothing that occurred in the course of their contact with him that led them to conclude that he couldn't read or write. He certainly can write; he has a very legible signature on the rights form, so we know he can write his name. And there is no evidence that he is suffering from any type of sub-normal mentality or a lack of education. Again, the only evidence there is that he could read and write, and that he was articulate enough to deal with the police in a matter that they didn't have any difficulty understanding his language. I think the court can also take notice of the transcript of the statement that he gave and there's certainly nothing in his responses or his interaction as recorded in that statement that would suggest that he was operat-

ing with any kind of mental or intellectual impairment.

She also noted that he had multiple previous contacts with the criminal justice system and had not shown signs of intoxication when giving the statement. The judge also stated that there was no evidence of coercion by the police, which was a significant factor in her mind. Ultimately, the judge found that Appellant's statement had been made voluntarily based on the totality of the circumstances, which included Appellant's circumstances and the non-coercive conduct of the police. (It should be noted that issues related to Appellant's alleged mental retardation, discussed above, were first raised after the suppression hearing and the judge's ruling on it in October 2000.)

The trial judge's emphasis on Appellant's mental capacity in the course of her ruling seems to indicate that the sort of evidence related to his alleged mental retardation (both that which was later presented at trial and that which he now claims his attorneys should have found and introduced) could have been relevant and might have led to a different result, thus supporting a finding of ineffectiveness under *Strickland*. However, neither prong of *Strickland* is satisfied.

First, Appellant's lawyers' failure to introduce evidence of his low intellectual function at the suppression hearing was not unreasonable. This Court has previously held that a low IQ "alone is an insufficient basis for find[ing] the statement was involuntary." *Holloman v. Commonwealth*, 37 S.W.3d 764, 769 (Ky.2001); *see also Lewis v. Commonwealth*, 42 S.W.3d 605, 612 (Ky.2001) ("[T]the mere existence of a mental condition, by itself and apart from its relation to police coercion, does not make a statement constitutionally involuntary."); *Colorado v. Connelly*, 479 U.S. 157, 164–65, 107 S.Ct. 515, 520–21, 93 L.Ed.2d 473 (1986) (holding that mental condition alone should never be dispositive of the voluntariness question). As the circuit court noted here, the key decision to be made is whether the police acted in a coercive manner, with a defendant's mental condition having bearing only as a factor in determining whether coercion occurred. *Connelly*, 479 U.S. at 163–65, 107 S.Ct. at 520–21; *see also Procunier v. Atchley*, 400 U.S. 446, 453–54, 91 S.Ct. 485, 489, 27 L.Ed.2d 524 (1971) ("Low intelligence, denial of the right to counsel, and failure to advise of the right to remain silent were not in themselves coercive. Rather they were relevant only in establishing a setting in which actual coercion might have been exerted to overcome the will of the suspect.").

Appellant attempts to side-step this precedent by presenting a more nuanced argument: that his *Miranda* waiver was not knowing, intelligent and voluntary, not that his confession itself was involuntary. This argument, however, ignores that *Colorado v. Connelly* directly addressed the question of a defendant's mental state on his ability to waive his *Miranda* rights, finding that the relevant question was whether police coercion was present. 479 U.S. at 170, 107 S.Ct. at 524. Though the extent to which low intelligence as a factor in establishing a waiver or voluntariness is being hotly debated and litigated, *compare Clark v. Mitchell*, 425 F.3d 270, 283 (6th Cir.2005) (holding that a mentally retarded defendant knowingly waived his rights), *with Garner v. Mitchell*, 502 F.3d 394, 417 (6th Cir.2007), *reh'g en banc granted, opinion vacated* (Jan. 3, 2008) (holding that defendant with "significant limitations on intellectual functioning" had not knowingly and voluntarily waived his rights), it is not at all clear that Appellant has established that his lawyers were unreasonable in not litigating this issue with regard to his con-

fession, since the law at the time of trial focused on police coercion.

Moreover, in light of the record, Appellant has not demonstrated he was prejudiced by the failure to introduce this evidence at the suppression hearing. Even viewed in its best light, the evidence Appellant claims his attorneys should have discovered and introduced would not establish sufficient mental limitations (that is, severe mental retardation) that the trial judge would have been compelled or even likely to have decided the matter in a different way. Her focus on the lack of police coerciveness would not have been disposed of by evidence of mental retardation or low intelligence on Appellant's part.

Thus, this Court concludes that Appellant was not entitled to an evidentiary hearing nor has he satisfied *Strickland* with regard to this issue.

### 4. Accuracy of and Rebuttal of the Jailhouse Informant's Allegations

At trial, the Commonwealth presented the testimony of a jailhouse informant, who claimed that Appellant confessed to the murders while in jail and stated that he intended to claim insanity. Appellant cites to various documents that he claims show the informant was never closer than 20 feet to his cell, thus making it highly unlikely that he garnered Appellant's trust or heard a confession. As noted by the circuit court, however, the affidavit on which the 20 feet claim is based discusses "cell # 18," but the informant claimed he was housed in a different cell ("# 16"). Appellant's brief does not address this, choosing instead simply to repeat almost verbatim (complete with incorrect case

names and citations) the argument originally presented to the trial court. While the record does not show how far cell # 16 was from Appellant's cell, this still clearly removes a factual underpinning of Appellant's current claim, namely the cell in which the informant was housed.

Appellant nevertheless claims that further investigation of the cells and the circumstances of his alleged confession to the informant was necessary for his trial counsel to be effective because it would have tended to show that the informant made up the story and further allowed exploration of the informant's motive (especially since the informant testified he had no deal with the Commonwealth). Appellant relies largely on *Roberts v. State*, 361 S.C. 1, 602 S.E.2d 768 (2004),[3] wherein the court found it to be ineffective assistance of counsel to fail to investigate the circumstances surrounding a similar jailhouse confession. In that case, however, there was evidence that the informant was housed at least 35 feet (and possibly 100 feet) away from the defendant and that the noise was often "deafening" and required shouting to communicate. Also another inmate claimed to have overheard the defendant and the informant talking and claimed no confession occurred. Finally, the defendant's lawyer admitted he was unprepared to confront the informant, who had been called as a witness unexpectedly and turned out to be crucial to the state's case.

Even assuming Appellant's allegation that the informant was housed 20 feet away from him in this case is true, none of the other factors from *Roberts* were alleged in the current RCr 11.42 motion. In fact, the testimony at trial was that the

---

**3.** At least, this Court assumes *Roberts* is the case Appellant relies on, since he refers to a "*Roberts v. State*, 602 S.E.2d 768 (2004)" in his brief and the RCr 11.42 motion. No such

case exists. However, the facts and citation of *Roberts* are similar enough to those described in Appellant's brief that it is clearly the case that was meant to be cited.

confession occurred at night when the noise level was low. Moreover, it is clear after reviewing the informant's testimony that Appellant's trial counsel was prepared to confront the informant on cross-examination and drew out facts to demonstrate his motive to lie, namely that the informant's own capital murder charge in another case had been reduced to manslaughter with a 15–year sentence, that he was now parole eligible, and that the Commonwealth would be expected to give a recommendation to the parole board (though again, there was no deal about what the recommendation would be). Finally, the informant's testimony was not the heart of the case against Appellant; his own confession to the crime and the testimony of the surviving child were.

Thus, this Court concludes that Appellant failed to articulate a sufficient claim of ineffective assistance of counsel. The single factual allegation about the location of the cells on which he relies does not render his trial counsel's performance ineffective, nor was Appellant prejudiced, since it is unlikely that further investigation or cross-examination would have altered the outcome at trial.

### 5. Expert Witness to Challenge the Credibility of the Child Witness

 Appellant also claims that his trial lawyers were deficient because they did not get an expert witness to attack the reliability of the child victim who testified against him. In support of his claim, Appellant notes that the child was only five years old when attacked and that his statement to police the day after the attack contained multiple inconsistencies (including that he did and did not see his mother stabbed and that the attacker was white, whereas Appellant is African–American) and appeared to be the result of undue suggestion or coercion.

This Court has held that when a defendant claims his counsel is ineffective by not obtaining expert assistance, "he must establish how he was prejudiced by the alleged failure of counsel. In claiming that the defense was deficient, the accused must establish that the performance by the attorney was objectively unreasonable and how the alleged error prejudiced his defense." *Hodge v. Commonwealth,* 116 S.W.3d 463, 470–71 (Ky.2003). Appellant fails to demonstrate how an expert could have helped rebut the child's testimony. His claim ignores the fact that evidence at trial showed that the child identified Appellant as his attacker as soon as police and paramedics arrived, thus undercutting any claim that his subsequent identification of Appellant was the result only of suggestion or confusion. His claim also ignores the fact that his trial counsel did impeach the child by drawing out the inconsistencies in his statement on cross-examination. This Court thus cannot conclude that Appellant's trial lawyers were ineffective by failing to obtain an expert or that an expert would have helped his case.

### D. International Treaties

Appellant also claims that he is at least borderline mentally retarded and therefore exempt from execution because of the United States' being a party to several international treaties, including the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights. This is yet another issue that could have been raised on direct appeal (though Appellant has not even cited to where it was riot raised at trial), and is thus inappropriate in an RCr 11.42 context.

Also, as noted above, the trial court held that Appellant was not mentally retarded; this finding refutes any treaty claim based directly on his alleged mental retardation.

This Court has held that the "International Covenant does not require its members to abolish the death penalty" and that "the United States has agreed to abide by the covenant only to the extent that the 5th, 8th and 14th amendment ban cruel and unusual punishment." *Simmons v. Commonwealth*, 191 S.W.3d 557, 567 (Ky.2006). Thus, the treaties can be effective in this case only to the extent that the Eighth Amendment bars the execution of mentally retarded individuals. Since Appellant was found not to be mentally retarded at trial, his death sentence does not violate the Constitution and, by extension, the treaties in question.

Moreover, neither the Universal Declaration nor the International Covenant can have any effect here. The Universal Declaration is merely a " 'statement of principles' " and " 'not a treaty or international agreement,' " and thus it "does not of its own force impose obligations as a matter of international law." *Sosa v. Alvarez–Machain*, 542 U.S. 692, 734, 124 S.Ct. 2739, 2767, 159 L.Ed.2d 718 (2004) (quoting Humphrey, *The UN Charter and the Universal Declaration of Human Rights*, in The International Protection of Human Rights 39, 50 (E. Luard ed.1967)). Also, the U.S. Supreme Court has recently reiterated that to be binding on the states, treaties must either be self-executing or carried out by way of legislation. *Medellin v. Texas*, —— U.S. ——, 128 S.Ct. 1346, 1356, 170 L.Ed.2d 190 (2008). The International Covenant is neither self-executing nor has it been implemented by way of domestic legislation. *See Buell v. Mitchell*, 274 F.3d 337, 372 (6th Cir.2001). Even assuming that *Atkins* and KRS 532.130–.140 have somehow inadvertently implemented the requirements of the International Convention, as discussed above, the requirement of both were satisfied in this case by the trial court prior to Appellant's trial.

### E. Cumulative Error

Finally, Appellant claims that the cumulative effect of the errors alleged in his RCr 11.42 motion merit setting aside his convictions and sentences. There was no cumulative error in this case sufficient to require setting aside Appellant's sentence.

### III. Conclusion

For the foregoing reasons, the Jefferson Circuit Court's Order denying Appellant's RCr 11.42 motion is affirmed.

MINTON, C.J.; CUNNINGHAM, SCHRODER, SCOTT and VENTERS, JJ., concur.

ABRAMSON, J., not sitting.