## THE STATE OF SOUTH CAROLINA
### In The Supreme Court

Louis Michael Winkler, Jr., Respondent,

v.

State of South Carolina, Petitioner.

Appellate Case No. 2014-000904

---

## ON WRIT OF CERTIORARI

---

Appeal From Horry County
James E. Lockemy, Trial Court Judge
Benjamin H. Culbertson, Post-Conviction Relief Judge

---

Opinion No. 27685
Heard April 13, 2016 – Filed November 23, 2016

---

## REVERSED AND REMANDED

---

Attorney General Alan Wilson, Chief Deputy Attorney
General John W. McIntosh, Senior Assistant Deputy
Attorney General Donald J. Zelenka, Assistant Attorney
General J. Anthony Mabry and Assistant Attorney
General Alphonso Simon, Jr., all of Columbia, for
Petitioner.

Emily C. Paavola, of Justice 360, of Columbia, and John
R. Mills, of San Francisco, California, for Respondent.

---

**JUSTICE FEW:** This is a post-conviction relief (PCR) action arising out of
Louis Michael Winkler, Jr.'s murder conviction and death sentence. We reverse
the PCR court's ruling that trial counsel was ineffective in the sentencing phase of

Winkler's trial for not objecting when the trial court did not answer the jury's questions about the consequences of a failure to reach a unanimous verdict. We also reverse the PCR court's denial of Winkler's pretrial motions in the PCR action in which he requested additional time to obtain and analyze evidence related to his alleged brain damage. Because the denial of additional time deprived Winkler of the opportunity to adequately develop his PCR claim that trial counsel was ineffective for failing to investigate brain damage, we vacate the PCR court's ruling denying that claim. We remand to the PCR court for further proceedings.

## I.        Procedural History

On the evening of the murder, Winkler kicked in the door to his estranged wife's home, knocked her son to the ground, and shot her in the face, killing her instantly. In addition to murder, Winkler was convicted of first-degree burglary and assault and battery of a high and aggravated nature. We described the specific facts of the crimes in our opinion affirming the convictions and death sentence on direct appeal. *State v. Winkler*, 388 S.C. 574, 579-82, 698 S.E.2d 596, 599-600 (2010), *cert. denied*, 563 U.S. 963 (2011).

After Winkler filed an application for PCR, the PCR court entered a scheduling order that it later amended to set a specific trial date. Winkler twice moved to amend the scheduling order so PCR counsel could have more time to obtain and analyze MRI and PET scans of his brain to investigate the possibility of brain damage. On the first motion, the PCR court extended the deadline for filing an amended application, but refused to extend any other deadlines, including the trial date. The PCR court denied the second motion.

At the close of Winkler's presentation of evidence at the PCR trial, the court granted the State a directed verdict on Winkler's claim that his trial counsel—Ralph Wilson and Paul Rathbun—were ineffective in failing to investigate and present evidence of Winkler's brain damage. In its final order, the court found Winkler "did not present any evidence that he suffered from neurological and cognitive impairments or dysfunction."

However, the court granted Winkler PCR on the ground that trial counsel were ineffective in the sentencing phase of the criminal trial when they did not object to the trial court's refusal to answer the jury's questions as to what would happen if the jury could not reach a unanimous verdict on Winkler's sentence. Instead of ordering a new sentencing proceeding, the PCR court "sentenced" Winkler to life in prison.

In the sentencing phase, after deliberating for more than six and a half hours, the jury sent a note to the trial court asking, "Could you please explain what happens if we're not able to reach a unanimous decision?"  The trial court, the State, and Winkler's trial counsel agreed the note was not a communication the jury was deadlocked.  The trial court sent a written response to the jury's note stating, "I cannot answer the question the way you phrased it.  Please let me know if you have any other questions."  Trial counsel did not object.

After the jury deliberated for approximately two more hours, the trial court sent another written note to the jury asking, "do you have any questions or messages for the court?"  The jury replied "[W]hat [does] the law state when a jury does not reach any unanimous decision at this stage of the trial?"  The trial court then sent a note to the jury stating, "I cannot answer hypothetical questions.  Do you have any specific questions to ask or comments that you would like to make about your jury?"  Trial counsel did not object.

Sometime later, the jury sent a note indicating it was having difficulty reaching a verdict.  The trial court then decided to give the jury a version of an *Allen*[1] charge.  At 12:26 a.m., the trial court gave the jury a modified *Allen* charge.  In the charge, it informed the jury two times "the decision of the jury must be unanimous."  After giving the charge, the trial court allowed the jury to choose whether to continue deliberating that night or come back the next day.  The jury chose to return the next morning.

The following morning, before the jury resumed deliberations, the trial court told the jury to let it know if the jury needed to re-hear the *Allen* charge.  One juror requested to re-hear the charge.  Wilson initially objected, arguing it was inappropriate to give the charge again.  After a discussion with the solicitor and the trial court, however, Wilson withdrew his objection.  The trial court then re-read the modified *Allen* charge.  Less than an hour later, the jury returned a verdict recommending the death penalty.

After the PCR court granted Winkler PCR, the State and Winkler each filed a petition for a writ of certiorari.  We granted certiorari on three questions: (1) whether the PCR court erred "in finding trial counsel were ineffective in failing to object when the trial judge declined to answer the jury's questions regarding the

---

[1] *Allen v. United States*, 164 U.S. 492, 17 S. Ct. 154, 41 L. Ed. 528 (1896).

consequences of a failure to reach a unanimous verdict in a capital murder sentencing proceeding in light of the trial judge's instruction to the jury that a recommendation of either death or life imprisonment must be unanimous;" (2) whether the PCR court "abuse[d its] discretion in denying [Winkler's] motion to alter the PCR scheduling order and therefore err[ed] in finding [Winkler] failed to carry his burden of proving trial counsel were ineffective in failing to investigate mitigating evidence of brain damage;" and (3) whether "the PCR court err[ed] in failing to remand for a new sentencing proceeding."  We denied certiorari on all other issues, including the State's argument the PCR court erred in finding trial counsel was ineffective for not objecting to the *Allen* charge.

## II.    *Allen* Charge

Before we reach the merits of the questions as to which we granted the writ of certiorari, we address Winkler's argument we should dismiss the writ because of an issue as to which we denied certiorari.  Winkler argues the PCR court granted relief on the independent basis that trial counsel was ineffective for not objecting to an unconstitutionally coercive *Allen* charge and that ruling renders his PCR final, regardless of the outcome of this appeal.  *See Dawson v. State*, 352 S.C. 15, 20, 572 S.E.2d 445, 447 (2002) (stating an *Allen* charge cannot be unconstitutionally coercive, "but must instead be even-handed, directing both the majority and the minority to consider the other's views").  Thus, Winkler argues, we do not need to consider the question of whether trial counsel was ineffective for not objecting to the trial court's decision not to answer the jury's questions.

The PCR court's final order is confusing on this point.  The issue is further confused by the fact the State petitioned for certiorari claiming "the PCR court erred in finding trial counsel was ineffective for not objecting to the *Allen* charge." However, we find the PCR court did not rule trial counsel was ineffective for not objecting to the *Allen* charge.  Rather, the PCR court granted Winkler relief based only on trial counsel's decision not to object to the trial court not answering the jury's questions regarding a failure to reach a unanimous verdict.  In doing so, the PCR court relied in part on its conclusion that the modified *Allen* charge contained an incorrect statement of law because the charge stated the decision of the jury must be unanimous.  Because the PCR court did not grant Winkler relief on the independent ground that trial counsel was ineffective in not objecting to the modified *Allen* charge, we deny Winkler's request that we dismiss the writ of certiorari, and we proceed to address the merits of the questions on which we granted certiorari.

### III.   The Failure to Reach a Verdict Issue

We consider claims for ineffective assistance of counsel under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  To obtain PCR under the *Strickland* test, the applicant must show "(1) counsel's representation fell below an objective standard of reasonableness and (2) but for counsel's error, there is a reasonable probability that the outcome of the proceeding would have been different."  *Williams v. State*, 363 S.C. 341, 343, 611 S.E.2d 232, 233 (2005) (citing *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064, 80 L. E. 2d at 693).

Winkler contends his counsel's performance fell below an objective standard of reasonableness because they should have objected to the trial court's decision not to answer the jury's questions.  Winkler bases his argument initially on South Carolina Code subsection 16-3-20(C) (2015), which provides,

> If members of the jury after a reasonable deliberation
> cannot agree on a recommendation as to whether or not
> the death sentence should be imposed on a defendant
> found guilty of murder, the trial judge shall dismiss such
> jury and shall sentence the defendant to life
> imprisonment as provided in subsection (A).

Winkler argues that when the jury asked what would happen if it did not reach a unanimous sentencing verdict, the trial court was required under subsection 16-3-20(C), due process,[2] and the Eighth Amendment[3] to inform the jury the defendant would be sentenced to life in prison, which "means until the death of the defendant without the possibility of parole."  S.C. Code Ann. § 16-3-20(A) (2015).  When the trial court refused to inform the jury of this, Winkler argues, his trial counsel should have objected.

---

[2] *See* U.S. CONST. amend. XIV, § 1 ("No state shall . . . deprive any person of life . . . without due process of law; . . . ."); S.C. CONST. art. I, § 3 ("nor shall any person be deprived of life . . . without due process of law").

[3] *See* U.S. CONST. amend. VIII ("nor cruel and unusual punishments inflicted"); *Romano v. Oklahoma*, 512 U.S. 1, 8-10, 114 S. Ct. 2004, 2010, 129 L. Ed. 2d 1, 10-11 (1994) (summarizing prior case law to recognize the Eighth Amendment prevents misleading the jury regarding its role in the sentencing process).

The PCR court agreed. The court concluded "the jury is entitled to an instruction that the defendant's sentence becomes a matter of law to be imposed by the court if they cannot reach a unanimous verdict." Based on that conclusion, the PCR court found trial counsel was unreasonable in not objecting to the trial court's refusal to answer the jury's questions, and thus counsel's performance was deficient and Winkler satisfied the first prong of *Strickland*. We disagree.

At the PCR trial, Winkler's PCR counsel gave trial counsel Ralph Wilson a chance to explain why he didn't object. Wilson testified "my understanding is . . . if a jury asks a question about what happens if they're deadlocked then the Judge can't then tell them . . . that this defendant is going to get a life sentence." As we will explain, trial counsel's understanding was consistent with applicable precedent. In fact, we can find no South Carolina or federal precedent on which Winkler's trial counsel could have relied to support making an objection. The PCR court's conclusion, on the other hand, had no support in South Carolina or federal precedent. Thus, we find the PCR court's conclusion was an error of law, and the error controlled its finding as to trial counsel's performance. *See Jordan v. State*, 406 S.C. 443, 448, 752 S.E.2d 538, 540 (2013) (stating we "will reverse the decision of the PCR court when it is controlled by an error of law"); *Edwards v. State*, 392 S.C. 449, 455, 710 S.E.2d 60, 64 (2011) ("The appellate court will reverse the PCR court only where there is either no probative evidence to support the decision or the decision was controlled by an error of law."). Because no applicable precedent supported making an objection, we find trial counsel's decision not to object was reasonable. *See Harden v. State*, 360 S.C. 405, 408, 602 S.E.2d 48, 49 (2004) (stating trial counsel was not deficient in not objecting when there was "no statutory law or judicial precedent in this State" on which to base an objection).

In *State v. Adams*, 277 S.C. 115, 283 S.E.2d 582 (1981),[4] the appellant argued "the trial judge erred by failing to instruct the jury initially that if they failed to agree to the verdict, then the court would be required to sentence him to life imprisonment." 277 S.C. at 124, 283 S.E.2d at 587. We found no error, and held—referring to subsection 16-3-20(C)[5]—"[t]hat portion of the statute addressing the legal effect

---

[4] *Overruled on other grounds by State v. Torrence*, 305 S.C. 45, 406 S.E.2d 315 (1991).

[5] The language of the applicable sentence in subsection 16-3-20(C) has been amended slightly since we decided *Adams*. *See* Act No. 83, 1995 S.C. Acts 560-61

given to the existence of an unalterably divided jury is addressed to the trial judge only and need not be divulged to the jury." *Id*.

In *State v. Copeland*, 278 S.C. 572, 300 S.E.2d 63 (1982), we again addressed the question of whether the trial court "erred in denying [the defendant's] request to instruct the jury of the actual effect of failure to reach a unanimous agreement as to punishment." 278 S.C. at 584, 300 S.E.2d at 70. The appellant in *Copeland* also claimed—like here—the trial court erred "in instructing the jury that unanimity is required before a life sentence can be imposed." *Id*. Quoting *Adams*, we affirmed the trial court's refusal to charge the substance of subsection 16-3-20(C) and its instruction that the "verdict or recommendation" must be unanimous. *Id*. We held, "The trial judge correctly stated the applicable law." *Id*.

Trial counsel's understanding was also consistent with federal precedent. In *Evans v. Thompson*, 881 F.2d 117 (4th Cir. 1989), the Fourth Circuit reviewed the denial of a habeas corpus petition that arose out of the petitioner's death sentence in Virginia. 881 F.2d at 119. Similar to the situation here, the jury "inquir[ed] of whether a life sentence must be unanimous," and the petitioner argued "the trial judge improperly failed to instruct the jury that under Virginia law a split decision by a capital sentencing jury automatically becomes life." 881 F.2d at 123. Also similar to this case, the petitioner argued "he was denied his due process rights because the trial judge improperly instructed the jury that a sentence of life imprisonment could be imposed only by a unanimous verdict." *Id*. Alleging a due process violation, the petitioner made the same argument upon which Winkler now claims his trial counsel should have objected, and the Fourth Circuit found the argument "without merit." *Id*. The court held, "No obligation exists for the trial judge to inform the jury of the ultimate result should they fail to reach a verdict." *Id*. (citing *Barfield v. Harris,* 540 F. Supp. 451, 472 (E.D.N.C. 1982), *aff'd*, 719 F.2d 58 (4th Cir. 1983)).

In *Jones v. United States*, 527 U.S. 373, 119 S. Ct. 2090, 144 L. Ed. 2d 370 (1999), the Supreme Court of the United States addressed the question "whether petitioner was entitled to an instruction as to the effect of jury deadlock" in the penalty phase of his federal capital trial. 527 U.S. at 375, 119 S. Ct. at 2096, 144 L. Ed. 2d at 378. The Supreme Court held "the Eighth Amendment does not require that the jurors be instructed as to the consequences of their failure to agree." 527 U.S. at 381, 119 S. Ct. at 2098, 144 L. Ed. 2d at 382. The Court also found applicable

---

(enacting the current language for the sentence). The sentence as it read in 1981 is quoted in *Adams*. 277 S.C. at 124, 283 S.E.2d at 587.

federal statutes do not require the instruction, and declined to exercise its "supervisory powers" to require the instruction. 527 U.S. at 381, 383, 119 S. Ct. at 2098, 2099, 144 L. Ed. 2d at 382, 383.

The first prong of the *Strickland* test requires a court to assess counsel's performance against an objective standard of reasonableness. *Edwards*, 392 S.C. at 456, 710 S.E.2d at 64. One of the key circumstances a court must consider in its examination of counsel's decision not to make a particular objection is whether there was any law to support the objection. In *Harden*, the issue before this Court was whether plea counsel's performance was deficient when he did not object on the grounds of double jeopardy to the petitioner being convicted of drug trafficking based on conspiracy and drug distribution. 360 S.C. at 408, 602 S.E.2d at 49. We upheld counsel's performance because we found "no statutory law or judicial precedent in this State . . . holds a conviction for both conspiracy and the substantive offense relating to the conspiracy . . . constitutes double jeopardy." *Id.* Because the law did not support the double jeopardy objection, we found counsel acted reasonably in not making it. *Id.* We stated, "An attorney is not required to anticipate potential changes in the law which are not in existence at the time of the conviction." *Id.*; *see also Thornes v. State*, 310 S.C. 306, 309-10, 426 S.E.2d 764, 765 (1993) (stating, "This Court has never required an attorney to anticipate or discover changes in the law," and citing cases to illustrate the point).

The situation here is comparable to *Harden*. At the time of Winkler's trial, South Carolina law applicable to whether the trial court should charge the jury the consequences of the jury's failure to reach a verdict was limited to subsection 16-3-20(C) as interpreted in *Adams* and *Copeland*. Neither opinion provides any support for trial counsel making an objection, nor for the PCR court's finding that the jury is "entitled" to the charge. In fact, we read *Adams* and *Copeland* to suggest the court should not have answered the jury's question. We stated in *Adams* that subsection 16-3-20(C) "is addressed to the trial judge only and need not be divulged to the jury," 277 S.C. at 124, 283 S.E.2d at 587, and we quoted that statement in *Copeland*, 278 S.C. at 584, 300 S.E.2d at 70-71.

Federal precedent also provided no support for an objection. In *Evans*—a situation almost identical to this one—the Fourth Circuit found "no obligation" to inform the jury of the consequences of not reaching a verdict, 881 F.2d at 123, and *Jones* leaves no argument that federal law would have supported an objection, 527 U.S. at 381, 383, 119 S. Ct. at 2098, 2099, 144 L. Ed. 2d at 382, 383. All of those cases—*Adams*, *Copeland*, *Evans*, and *Jones*—were decided before Winkler's 2008

trial. The law, therefore, did not support trial counsel making an objection to the trial court's decision not to answer the jury's question.

Winkler relies heavily on the fact that *Adams*, *Copeland*, and *Jones* dealt only with the trial court's initial jury charge, but in this case the jury specifically asked what would happen if it could not reach a verdict. Winkler argues that when a jury "makes explicit" a question it has about the law, the trial court must answer the question "even where the jury is initially given proper instructions." We agree this case is different because in those cases the jury did not ask the question this jury asked. For three reasons, however, that difference does not change our decision. First, while this case might be distinguishable from *Adams*, *Copeland*, and *Jones* on the basis Winkler argues, it cannot be distinguished from *Evans*—in which the jury also "inquir[ed] of whether a life sentence must be unanimous." 881 F.2d at 123. We do not know the precise question asked by the jury in *Evans*. However, the argument the petitioner made as to how the question should have been answered is the same argument Winkler makes here. *Id.* In that almost identical factual scenario, the court held, "No obligation exists for the trial judge to inform the jury of the ultimate result should they fail to reach a verdict." *Id.*

Second, the significance of the difference between this case and *Adams*, *Copeland*, and *Jones* is limited by the fact that this is a PCR case. The issue in this PCR is not whether a trial court must answer the jury's question when trial counsel specifically requests it, but whether trial counsel should have objected to the trial court not giving an answer. Specifically, the issue before us is whether Winkler's trial counsel's decision not to make an objection was reasonable under the first prong of *Strickland*. *Adams* and *Copeland* are important to the resolution of this issue not because they are controlling—they are not—but because they were the only South Carolina precedent available to trial counsel when counsel made the decision not to object, and neither case provided any support for an objection. Similarly, *Jones* is not squarely on point with this case, but it does not support making an objection to the trial court's refusal to answer this jury's questions.

Third, Winkler's argument that a trial court must accurately explain a point of law when a jury asks a specific question about it depends on whether the answer to the question is applicable to the jury's deliberations. Even if a jury asks a specific question about a point of law, when the point is not applicable to the jury's deliberations, the trial court should not answer the question. *See generally State v. Weaver*, 265 S.C. 130, 137, 217 S.E.2d 31, 34 (1975) ("There was no duty of the trial judge to instruct the jury as requested by the appellant because such charge was not applicable to any issue in the case."). Therefore, the mere fact the jury

asked the specific question did not require the trial court to answer it. Rather, whether the trial court should have answered the question depended on whether the point of law about which the jury asked was applicable to the jury's deliberations.

Winkler argues that *Simmons v. South Carolina*, 512 U.S. 154, 114 S. Ct. 2187, 129 L. Ed. 2d 133 (1994), demonstrates the answer to the jury's questions was applicable to the jury's deliberations. In *Simmons*, the Supreme Court of the United States held the petitioner's due process rights were violated when the State made his future dangerousness a factual issue and the trial court refused to answer the jury's question as to petitioner's parole eligibility. 512 U.S. at 156, 114 S. Ct. at 2190, 129 L. Ed. 2d at 138; *see also State v. Starnes*, 340 S.C. 312, 326, 531 S.E.2d 907, 915 (2000) ("Due process is violated when the State 'raises[s] the specter of [the defendant's] future dangerousness generally, but then thwart[s] all efforts by [the defendant] to demonstrate that . . . he never would be released on parole and thus . . . would not pose a future danger to society.'" (alteration in original) (quoting *Simmons*, 512 U.S. at 165, 114 S. Ct. at 2194, 129 L. Ed. 2d at 143)). Due process required the jury's question to be answered in *Simmons* because the jury needed to know the law related to petitioner's parole eligibility to properly deliberate over the factual question of future dangerousness. *See, e.g.*, 512 U.S. at 165, 114 S. Ct. at 2194-95, 129 L. Ed. 2d at 144 (explaining that without an answer to the jury's question, "[t]he jury was left to speculate about petitioner's parole eligibility when evaluating petitioner's future dangerousness"). In *Simmons*, therefore, the answer to the jury's question was directly applicable to the jury's deliberations.

Here, on the other hand, we see little possibility that answering the jury's question could assist the jury in deliberations. A juror's knowledge that if the jury does not reach a verdict the court will impose a sentence of life in prison will not help the juror understand the evidence, or assist the jury in reaching a verdict. Rather, we are concerned that informing the jury what the sentence will be if they do not reach a verdict creates a risk that some juror's attention may be diverted away from the duty to deliberate, and perhaps even alert a juror that he or she can control the sentence by refusing to deliberate.

The Supreme Court of the United States addressed this concern in *Jones*. The petitioner requested the jury be charged, "In the event . . . the jury is unable to agree on a unanimous decision as to the sentence to be imposed, you should so advise me and I will impose a sentence of life imprisonment without possibility of release." 527 U.S. at 379, 119 S. Ct. at 2097-98, 144 L. Ed. 2d at 381. Addressing the Eighth Amendment argument that the jury could be "misled regarding its role

in the sentencing process" by the trial court's refusal to give the instruction, 527 U.S. at 381-82, 119 S. Ct. at 2099, 144 L. Ed. 2d at 382 (quoting *Romano,* 512 U.S. at 9, 114 S. Ct. at 2010, 129 L. Ed. 2d at 11), the Court explained:

> The truth of the matter is that the proposed instruction has no bearing on the jury's role in the sentencing process. Rather, it speaks to what happens in the event that the jury is unable to fulfill its role—when deliberations break down and the jury is unable to produce a unanimous sentence recommendation. . . . We have never suggested . . . that the Eighth Amendment requires a jury be instructed as to the consequences of a breakdown in the deliberative process. On the contrary, we have long been of the view that "[t]he very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves." We further have recognized that in a capital sentencing proceeding, the Government has "a strong interest in having the jury express the conscience of the community on the ultimate question of life or death." We are of the view that a charge to the jury of the sort proposed by petitioner might well have the effect of undermining this strong governmental interest.

527 U.S. at 382, 119 S. Ct. at 2099, 144 L. Ed. 2d at 382-83 (footnotes omitted) (first quoting *Allen*, 164 U.S. at 501, 17 S. Ct. at 157, 41 L. Ed. at 531; and then quoting *Lowenfield v. Phelps,* 484 U.S. 231, 238, 108 S. Ct. 546, 551, 98 L. Ed. 2d 568, 578 (1988)); *see also State v. McCarver*, 462 S.E.2d 25, 42 (N.C. 1995) (stating "to inform the jury that its failure to agree on determinative issues will result in a sentence of life imprisonment would be an open invitation to the jury— or a single juror—to avoid its responsibility to *fully* deliberate and to force a recommendation of life by the simple expedient of disagreeing").

Winkler's reliance on *Simmons* is misplaced because in that case the answer to the jury's question was necessary to enable the jury to understand and fully deliberate one of the key factual issues in the case. In this case, the consequence of not reaching a verdict was not applicable to the jury's deliberations, and informing the jury of that consequence could have created a risk of undermining the deliberations.

Winkler also argues the decision not to object was unreasonable in light of the trial court's instruction on two occasions during the modified *Allen* charge "the decision of the jury must be unanimous."[6] The trial court's instruction was correct in this respect, however, because a verdict must, under law, be unanimous.[7] *See* S.C. CONST. art. V, § 22 ("All jurors in any trial court must agree to a verdict in order to render the same."); *see also Copeland*, 278 S.C. at 584, 300 S.E.2d at 70 (holding the trial court "correctly stated the applicable law" when it charged the jury in the sentencing phase of a capital trial "your verdict or recommendation . . . must be unanimous on each count, that is, your verdict or recommendation must be the verdict or recommendation of all twelve of you"). Because a *verdict* must be unanimous, the *jury* may not recommend life unless it reaches a unanimous verdict. The fact that subsection 16-3-20(C) requires the trial court to impose a life sentence if the jury is not unanimous does not change the correctness of the statement "the decision of the *jury* must be unanimous." We find trial counsel's decision not to object to the trial court's refusal to answer the jury's questions is not rendered unreasonable by the trial court's instruction "the decision of the jury must be unanimous" because the trial court's charge in this respect was a correct statement of South Carolina law.

As we have explained, there was no legal support on which trial counsel could have relied to make an objection when the trial court refused to instruct the jury as to the consequences of not reaching a verdict in the sentencing phase of Winkler's trial. Therefore, the PCR court's finding that the jury was "entitled" to the instruction was an error of law that controlled its decision to grant PCR. *See*

---

[6] On several other occasions during the modified *Allen* charge, the trial court encouraged the jury to reach a unanimous verdict, or otherwise used the word unanimous. Only twice, however, did the trial judge instruct the jury its verdict "must" be unanimous.

[7] We do not intend in making this statement to comment on the propriety of including such an instruction in an *Allen* charge. *See Tucker v. Catoe*, 346 S.C. 483, 493, 552 S.E.2d 712, 717 (2001) (analyzing the circumstance that the "jury was told of the importance of a unanimous verdict" as a relevant factor in the analysis of whether an *Allen* charge was coercive). As we explained in section II of this opinion, whether the *Allen* charge here was coercive is not currently before us. We simply observe that the instruction "the decision of the jury must be unanimous" is a correct statement of law.

*Jordan*, 406 S.C. at 448, 752 S.E.2d at 540; *Edwards*, 392 S.C. at 455, 710 S.E.2d at 64.  We reverse the PCR court's ruling.

We are not prepared to hold that no situation will ever arise in which it is appropriate for the trial court to consider answering such a question.  If that situation does arise, however, the trial court should be careful to keep the jury focused on its duty to deliberate and not empower one juror to control the sentence by refusing to participate in deliberations.  *See Jones*, 527 U.S. at 382, 119 S. Ct. at 2099, 144 L. Ed. 2d at 382-83.

## IV.    The Brain Damage Issue

Winkler contends the PCR court abused its discretion when the court refused to grant his PCR counsel additional time in which to obtain and analyze MRI and PET scans of his brain.  Without this evidence, Winkler argues, "the PCR court's decision denying relief on this claim was not the product of a full and fair hearing." We agree the PCR court abused its discretion in not granting Winkler additional time.

### A.    Relevant Facts

Winkler filed his initial application for PCR on May 2, 2011 with the assistance of the appellate defender who represented him on direct appeal.  On June 24, 2011, as required by subsection 17-27-160(B) of the South Carolina Code (2014), the PCR court appointed new counsel—Emily Paavola and John R. Mills—who had not previously represented Winkler.  Winkler's initial application did not include a claim for ineffective assistance of counsel for failing to properly investigate brain damage.

Subsection 17-27-160(C) of the South Carolina Code (2014) provides, "Not later than thirty days after the filing of the state's return, the judge shall convene a status conference to schedule a hearing on the merits of the application for post-conviction relief."  In compliance with this requirement, the PCR court held a status conference on July 7, 2011.  Subsection 17-27-160(C) also requires the PCR trial "must be scheduled within one hundred eighty days from the date of the status conference, unless good cause is shown to justify a continuance."  At the July 7 status conference, the PCR court entered a scheduling order setting several deadlines, including (1) December 1, 2011 for filing an initial amended PCR application; (2) May 1, 2012 for filing a final amended PCR application; and (3) June 1, 2012 for completing discovery.  The July 7 order also provided the PCR

trial would be held on or before July 1, 2012. On September 21, 2011, the court amended the scheduling order to set the PCR trial for June 18, 2012.[8]

According to Winkler's brief in this appeal, "[a]pproximately two months into their investigation, counsel noted potential indicators of brain damage, . . . [and] asked the PCR court to grant funding for consultation with a neuropsychologist."[9] The PCR court granted the funding request on September 9, 2011. September 9 order stated, "Present counsel's preliminary investigation has uncovered potential neuropsychological impairments, and the record suggests that trial counsel failed to obtain the services of a neuropsychologist." PCR counsel promptly retained a neuropsychologist, who on November 2 recommended to counsel they "consider consulting with a neurologist or neuropsychiatrist" for further information about Winkler's brain damage. The neuropsychologist also informed counsel "it would be very helpful to have neuroimaging." On November 3, counsel requested funding to obtain the neuroimaging—MRI and PET scans of Winkler's brain—and to analyze the images. The PCR court entered an order on November 21 finding, "The record reflects that a neuropsychologist has recommended such imaging, and that it may uncover neurologic impairment or dysfuntion that trial counsel failed to discover." The PCR court found the request "appropriate," the neuroimaging and analysis "reasonable and necessary," and ordered funding.

On November 30, Winkler filed a motion to extend the deadlines in the scheduling order by ninety days. In the motion, counsel represented to the PCR court that they had "begun the process of having these tests ordered by the local expert," but they were "advised that it will take approximately 4 to 6 weeks before the initial testing can be completed, and approximately 6 weeks after that before additional analysis can be conducted by the out-of-state expert." Thus, PCR counsel could not obtain the test results and determine whether they supported amending Winkler's PCR application for at least ten weeks, or approximately mid-February—long after the December 1 deadline for the initial amendment. On December 8, the PCR court amended the scheduling order to extend the deadline for filing an initial amended PCR application to February 2, 2012 and a final amended application by May 1,

_____

[8] The July 7 and September 21 orders are in not the Appendix. While we have no doubt that good cause existed for extending the trial date beyond the 180 day provision in subsection 17-27-160(C), it does not appear that either order contained a specific finding of good cause.

[9] The appendix does not reflect the precise date of the funding request.

2012.  The PCR court denied counsel's request to extend the discovery deadline and the PCR trial date.

On January 26, 2012, Winkler was sent to the Medical University of South Carolina (MUSC) for the MRI and PET scans.  Winkler obtained the MRI scan, but he was unable to have a PET scan because his blood glucose level was 272 mg/dl—almost three times the normal level.  On February 7, a physician from MUSC wrote a letter to PCR counsel explaining, "If the patient has an abnormal blood glucose concentration, then the imaging will not produce a reliable result" and "Mr. Winkler's glucose concentration strongly suggests that he has untreated diabetes."

On February 14, PCR counsel wrote the Department of Corrections to confirm a phone conversation from the week before.  In the letter, counsel informed the Department of Corrections Winkler's testing indicated he likely had untreated diabetes and counsel requested "Mr. Winkler receive testing and treatment for his blood sugar . . . as soon as possible."  On April 4, the physician from MUSC wrote PCR counsel: "Based on my review of Mr. Winkler's medical summary . . . , it appears that Mr. Winkler has finally begun treatment for his diabetes.  However, his blood sugar appears to remain far enough outside of the normal range that we cannot perform an accurate study."  The physician predicted it would take "six to eight weeks of attentive treatment for glucose concentration to return to the normal range."  On April 5, the physician who was to analyze the scans wrote to counsel and indicated "Conducting the analyses normally takes approximately six to eight weeks from the time the images are received."

On April 10, 2012, Winkler filed a second motion to extend the deadlines in the scheduling order.  He asked specifically for "a continuance of 180 days to file his final amended PCR application, and adjustments to the other scheduled dates accordingly."  In the motion, counsel represented, "Despite efforts to diligently investigate this case, for unforeseen circumstances beyond their control, counsel are not in a position to formulate, in good faith, all claims for post-conviction relief by the May 1st deadline."  The PCR court denied the motion "without oral arguments or responsive brief."

### B.    Preservation

The State argues this issue is not properly before the Court because Winkler did not petition for certiorari from the PCR court's ruling denying the motions to extend the deadlines in the scheduling order.  Instead, Winkler raised the issue in

his return to the State's petition.  We find the issue is properly before us because the issue was presented to the PCR court, ruled on by the PCR court, presented to this Court, and the State responded.  *See Herron v. Century BMW*, 395 S.C. 461, 465, 719 S.E.2d 640, 642 (2011) (stating issue preservation rules are "meant to enable the lower court to rule properly after it has considered all relevant facts, laws, and arguments" (quoting *I'On, L.L.C. v. Mt. Pleasant*, 338 S.C. 406, 422, 526 S.E.2d 716, 724 (2000))); *In re Michael H.*, 360 S.C. 540, 546, 602 S.E.2d 729, 732 (2004) ("In order to preserve an issue for appeal, it must be raised to and ruled upon by the trial court.  In other words, the trial court must be given an opportunity to resolve the issue before it is presented to the appellate court." (citing *Wilder Corp. v. Wilke,* 330 S.C. 71, 76, 497 S.E.2d 731, 733 (1998))).

### C.    Abuse of Discretion

We applaud the PCR court in its effort to comply with section 17-27-160's goal of expediting PCR trials in death penalty cases.  *See* S.C. Code Ann. § 17-27-160(E) (2014) (referring to "*expedited* capital post-conviction relief hearings" (emphasis added)).  However, subsection 17-27-160(C) provides the PCR court should grant additional time if "good cause is shown to justify a continuance."  When Winkler's PCR counsel filed the second motion to extend the deadlines in the scheduling order, the PCR court found Winkler had "ample opportunity to investigate matters pertaining to the applicant's 'potential brain damage' and 'mental health disorder.'"  We disagree with that finding.

PCR counsel was appointed on June 24, 2011 with no prior familiarity with the case.  The trial transcript alone is 2955 pages.  Within two months of their appointment, counsel discovered "potential indicators of brain damage" and evidence that trial counsel did not investigate it.  Counsel promptly sought funding for a neuropsychologist, who in turn recommended neuroimaging.  Counsel promptly sought funding for the neuroimaging.  When counsel discovered it could take three months to get the results of the neuroimaging, they promptly filed a motion seeking more time.  Winkler's doctors then discovered he had a previously undiagnosed medical condition that would prevent accurate results from the neuroimaging.  Counsel promptly attempted to get Winkler the medical treatment he needed to enable reliable neuroimaging.  From our review of these exchanges between PCR counsel and Winkler's doctors, counsel acted efficiently in attempting to obtain the neuroimaging the PCR court had previously ruled was necessary.  Nevertheless, in early April 2012—two months before the scheduled trial date—Winkler's doctors informed PCR counsel it would take three to four months to obtain the results of the neuroimaging.  Under these circumstances, we

find no evidence to support a finding that PCR counsel had "ample opportunity" to develop the case related to brain damage.  Rather, based on the detailed documentation of their investigation on the brain damage issue, we find it would have been impossible for PCR counsel to obtain PET scans in time to have an expert review them and be prepared to testify at the PCR trial.  Therefore, "good cause [was] shown to justify a continuance."  § 17-27-160(C).

We find the PCR court abused its discretion in denying Winkler's second motion for additional time.  This ruling left PCR counsel in a position from which they could not present evidence to support the claim that trial counsel was ineffective for failing to investigate Winkler's brain damage.  We find, therefore, the PCR court's ruling on the brain damage claim should be vacated.

## V.     Conclusion

We granted certiorari on three questions.  As to the first question, we **REVERSE** the PCR court's ruling that Winkler's trial counsel was ineffective for not objecting to the trial court's decision not to answer the jury's questions about the result of not reaching a unanimous verdict.  As to the second question, we **REVERSE** the PCR court's denial of Winkler's second motion for additional time in which to obtain and analyze MRI and PET scans of his brain.  Based on our ruling, the PCR court's subsequent denial of PCR as to trial counsel's alleged failure to investigate and present evidence of his brain damage was also in error and is **VACATED**.  Because of our ruling on the first question, we need not reach the third question—the propriety of the PCR court's attempt to sentence Winkler to life in prison instead of remanding to the court of general sessions for a new sentencing proceeding.

We **REMAND** to the PCR court for further proceedings.

**KITTREDGE, J., concurs.  HEARN, J., concurring in a separate opinion.  PLEICONES, C.J., concurring in part and dissenting in part in a separate opinion in which BEATTY, J., concurs.**

**JUSTICE HEARN**:    Although I concur fully with the majority, I write separately to address an additional error of law committed by the PCR court that I believe requires reversal.  Specifically, the PCR court allowed two jurors to testify as to the jury's deliberative process in contravention of Rule 606(b) of the South Carolina Rules of Evidence.[10]  For this reason, I would reverse and remand for a new PCR hearing and thus concur fully but write separately.

In his PCR application, Winkler alleged members of the jury physically intimidated the only African American juror to change his vote from life to death during sentencing deliberations.  Before the PCR hearing began, the State made a motion to exclude any testimony by the jurors pursuant to Rule 606(b), but the court denied the motion and allowed PCR counsel to call two jurors, Juror Wallingford and Juror Roughton, to testify as to this issue.

Prior to the jurors being called, the State renewed its objection to their testimony based on Rule 606 grounds.  In both instances, the PCR court allowed the testimony, stating that as the factfinder at the PCR hearing, it could discern the portions of admissible testimony from the portions of inadmissible testimony.  The two jurors then testified—without further objection from the State—as to specifics that occurred during the jury's deliberations during the sentencing phase, including the way they initially voted and the reasons they changed their votes from life to death.[11]

---

[10] *See* Rule 606(b), SCRE (prohibiting post-verdict juror testimony regarding the jury's internal workings); *Shumpert v. State*, 378 S.C. 62, 66–67, 661 S.E.2d 369, 371 (2008) (explaining Rule 606, SCRE, allows evidence regarding external influences on the jury's deliberations to be introduced, but prohibits introducing evidence of internal influences affecting the jury's verdict—such as comments made during deliberations, or the effects of those comments—unless such evidence is necessary to ensure the trial's fundamental fairness).

[11] Winkler argues because the State did not object during the jurors' testimony, this issue is unpreserved.  *See generally State v. Johnson*, 324 S.C. 38, 41, 476 S.E.2d 681, 682 (1996) (holding that a contemporaneous objection to allegedly inadmissible testimony is required to properly preserve the error for appellate review (citation omitted)).  I disagree and would find the issue preserved because when the PCR court overruled the State's Rule 606(b) objection and stated it would determine the admissibility of the testimony received, it relieved the State of its burden to contemporaneously object to the inadmissible portions of the testimony.  *See State v. Bryant*, 316 S.C. 216, 220, 447 S.E.2d 852, 855 (1994) (finding to preserve an issue for appellate review, a party need not move to strike testimony

In particular, Juror Wallingford (the African American juror) testified that contrary to PCR counsel's assertions, he was not physically coerced or racially threatened into changing his vote from life to death. Moreover, although Juror Roughton's testimony briefly touched on Juror Wallingford's treatment at the hands of the other jurors, PCR counsel primarily elicited testimony about Juror Roughton's reasons for changing her vote from life to death. Juror Roughton testified she suffered extreme regret over changing her mind and voting for death, and in retrospect, she did not believe Winkler deserved the death penalty. Further, Juror Roughton testified she—and possibly several other jurors—were extremely confused over the trial court's jury instructions, particularly as they related to whether the sentence (death *or* life) had to be unanimous. Juror Roughton stated she believed if the jury did not unanimously choose death, Winkler would be acquitted and "be out."

At the close of Winkler's case-in-chief, the State moved for a directed verdict on the claim that the lone African American juror was physically threatened to change his vote from life to death. PCR counsel conceded there was no evidence of physical coercion and withdrew the claim.[12]

Later, in the initial order granting relief, the PCR court found trial counsel was deficient during the sentencing phase for failing to object to the trial court's "refusal to answer the jury's questions on what would happen if the jury could not reach a unanimous verdict on Winkler's sentence." The PCR court found that deficiency prejudiced Winkler, although it did not cite any specific facts in support of its finding. Rather, the PCR court stated only, "Had the jury's questions been answered by the judge, a reasonable probability exists that the jury would not have reached a unanimous verdict and the [trial] court would have imposed a sentence of life in prison."[13] Upon the State's motion to alter or amend the judgment, the

_____

which the trial court had already ruled was proper, as such a motion would have been futile); *State v. Ross*, 272 S.C. 56, 60–61, 249 S.E.2d 159, 162 (1978) (holding that once the judge rules on an objection, counsel need not repeat the objection after each question).

[12] The State also moved for a directed verdict on Winkler's claim that the trial court's *Allen* charge was unduly coercive. *See Allen v. United States*, 164 U.S. 492 (1896). The State argued, *inter alia*, PCR counsel was attempting to support its claim by using Juror Roughton's testimony about what caused her to change her mind and vote for death instead of life in violation of Rule 606(b), SCRE. The PCR court denied the State's motion for a directed verdict as to that issue.

[13] Generally, a defendant's direct appeal centers on the trial judge's errors, whereas

PCR court further explicated its prejudice finding, citing exclusively to Juror Roughton's testimony regarding the jury's confusion and her regret.[14]

Rule 606(b), SCRE, states:

Upon an inquiry into the validity of a verdict or indictment, *a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith*, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

---

PCR focuses on trial counsel's mistakes. Thus, given the procedural posture of this case, I find it significant that the PCR court appeared to find error in the trial *judge's* failure to answer the questions, rather than trial *counsel's* failure to object to the judge's actions. Regardless, as outlined by the majority, it is at best unclear whether an objection would have prompted the trial court to answer the jury's questions.

[14] In discussing the prejudice resulting from counsel's failure to object, the PCR court merely stated:

[T]he testimony presented at this [PCR] trial clearly indicates that at least one juror who opposed the death sentence and desired a life sentence incorrectly thought that the applicant would be free from any sentence unless the jury reached a unanimous decision on sentencing. That juror was led to believe that the applicant would be free to go or, at a minimum, would receive a new trial on his guilt or innocence unless the jury reached a unanimous decision of death or life in prison. The evidence indicates that the jury's unanimous decision to impose the death sentence in this case was not based upon a correct understanding of the law but, rather, on the incorrect thought that the applicant would go free or get a new trial.

(Emphasis added). Nonetheless, the Court has previously held that "juror testimony involving internal misconduct may be received [] when necessary to ensure fundamental fairness." *Shumpert*, 378 S.C. at 67, 661 S.E.2d at 371.

Fundamental fairness is an extremely high bar that essentially requires a defendant to demonstrate the jury's verdict amounted to a denial of his right to due process. *Id.* at 68, 661 S.E.2d at 372; *State v. Galbreath*, 359 S.C. 398, 406, 597 S.E.2d 845, 849 (Ct. App. 2004) (citing *State v. Hunter*, 320 S.C. 85, 88, 463 S.E.2d 314, 316 (1995)). In fact, the Court has thus far only recognized two types of allegations serious enough to implicate a trial's fundamental fairness: either (1) the jury's verdict was a result of racial or gender intimidation of a particular juror; or (2) the jury began its deliberations prior to the close of all of the evidence. *See Shumpert*, 378 S.C. at 67–68, 661 S.E.2d at 371–72 (discussing *State v. Aldret*, 333 S.C. 307, 314, 509 S.E.2d 811, 814 (1999); *Hunter*, 320 S.C. at 85, 463 S.E.2d at 314).

In numerous other cases the Court found, absent coercion, a juror's post-verdict testimony was inadmissible. *See, e.g.*, *State v. Pittman*, 373 S.C. 527, 554–55, 647 S.E.2d 144, 158 (2008); *Galbreath*, 359 S.C. at 405–07, 597 S.E.2d at 849. Often, such testimony contains merely a "generic assertion that a juror would vote the opposite way if given another opportunity," which the Court has previously found "too closely resembles a case of buyer's remorse from a guilty verdict to be given much credence." *Shumpert*, 378 S.C. at 68, 661 S.E.2d at 372. Moreover, even allegations that a juror misunderstood the law do not implicate fundamental fairness or due process. *Pittman*, 373 S.C. at 554, 647 S.E.2d at 158 (finding jurors' misunderstanding of the law and other "internal influences," such as incorrect information coming from other jurors, did not implicate fundamental fairness, and thus testimony to that effect was inadmissible); *Shumpert*, 378 S.C. at 68, 661 S.E.2d at 372 (same); *Galbreath*, 359 S.C. at 405, 406, 597 S.E.2d at 848, 849 (collecting out-of-state cases).

Here, Winkler's allegations of coercion—particularly involving the lone African American juror on the jury—raised a fundamental fairness issue and warranted the PCR court's admission of the jurors' testimony over the State's Rule 606(b) objection. *See Hunter*, 320 S.C. at 88, 463 S.E.2d at 316 ("We find allegations of racial prejudice [or intimidation] involve principles of fundamental fairness. Accordingly, the trial judge was proper in considering [the juror's]

testimony."). However, critically, *the PCR court should have granted the State's motion in part and limited the testimony to the allegations of coercion.* In failing to do so, I believe the PCR court committed an error of law.

Specifically, after the State's objection to each juror's testimony, the PCR court informed the State it would hear all of the testimony and later decide which portions were admissible and which were inadmissible. Thus, the PCR court erred in its interpretation of Rule 606(b), SCRE, by allowing PCR counsel to elicit a significant amount of testimony as to the jury's deliberative process. Moreover, the PCR court compounded this error by allowing the inadmissible portion of Juror Roughton's testimony to pervade its prejudice analysis in its final order, citing exclusively to Juror Roughton's confusion and regret over her decision to vote for death in support of its prejudice finding.[15] As such, there is no *admissible* evidence in the record to support the PCR court's findings, particularly with respect to prejudice, and I would reverse and remand for a new PCR hearing in which the jurors' testimony is excluded.[16] *See Dempsey v. State*, 363 S.C. 365, 368, 610 S.E.2d 812, 814 (2005) (stating the Court will reverse the PCR court if no probative evidence exists to support the PCR court's findings).

---

[15] Notably, much of Juror Roughton's testimony is precisely the type of testimony Rule 606(b) is designed to prohibit. *See Shumpert*, 378 S.C. at 68, 661 S.E.2d at 372 (stating courts should give little credence to testimony amounting to mere buyer's remorse). Indeed, she plainly stated she suffered (and continues to suffer) debilitating regret over her decision to vote in favor of the death penalty. Further, a portion of Juror Roughton's testimony revealed the jury may have been laboring under a misapprehension that Winkler might "be out" if it did not unanimously vote for death. At best, that testimony revealed the jury may have misunderstood the law, which the Court has repeatedly found does not implicate fundamental fairness. *See, e.g.*, *Pittman*, 373 S.C. at 554, 647 S.E.2d at 158; *Shumpert*, 378 S.C. at 68, 661 S.E.2d at 372.

[16] Because Winkler withdrew his claim that Juror Wallingford was coerced into voting for death, there are no remaining allegations implicating the fundamental fairness of the trial, and thus no additional allegations that would warrant admitting any of the jurors' testimony.

For the foregoing reasons, I concur fully with the majority.[17]

---

[17] The majority rightly declines to address a second, moot error of law committed by the PCR court. Specifically, after finding counsel ineffective during the sentencing phase, the PCR court vacated Winkler's death sentence and *sua sponte* imposed a sentence of life imprisonment without the possibility of parole. As the State argues, and Winkler concedes in his brief, should the PCR court vacate a death sentence, the appropriate remedy is not to itself impose a life sentence on the PCR applicant, but rather to remand the case back to the court of general sessions for a new sentencing proceeding. *Tucker v. Catoe*, 346 S.C. 483, 495, 552 S.E.2d 712, 718 (2001); *see also Singleton v. State*, 313 S.C. 75, 86, 437 S.E.2d 53, 59 (1993) (finding the appropriate relief to grant upon vacating a death sentence is remanding for a new sentencing hearing, and holding that imposing an automatic life sentence without a new sentencing hearing "appears to be beyond the scope of an appropriate remedy on PCR" (citations omitted)).

**CHIEF JUSTICE PLEICONES:**  I agree that we must reverse and remand the Post-Conviction Relief (PCR) order because the PCR judge abused his discretion in denying respondent-petitioner's (Winkler's) request for a continuance.  I write separately because I would uphold the PCR judge's finding that trial counsel were ineffective in failing to ask the trial judge to respond to the jury's inquires relating to the effect of a non-unanimous verdict.  Thus, I would hold that Winkler is entitled to a new sentencing proceeding[18] even if on remand he is unable to establish reversible error on the mental health issue.

I begin by noting that the majority approaches this case as if the burden were on Winkler, rather than on the State, to persuade the Court of reversible error in the PCR judge's ineffective assistance of counsel ruling and that this error pervades its analysis.  Even where the State is the petitioner, our standard of review requires that we affirm the PCR judge's factual findings if they are supported by any evidence of probative evidence in the record.  *E.g.*, *Roberts v. State*, 361 S.C. 1, 602 S.E.2d 768 (2004).  Further, as explained below, I believe the majority errs when it converts the PCR judge's factual conclusions into an error of law.

The PCR judge found that a reasonable attorney would have objected to the trial court's refusal to answer questions raised by the jury's notes asking what would happen if they could not reach a unanimous verdict.  The majority holds that the PCR judge's ruling was affected by an error of law because there was no state or federal precedent which would have supported a request by trial counsel that the jury be instructed that a deadlocked jury would result in a life sentence.  I believe that the PCR judge's order is more nuanced than the majority acknowledges.  In finding counsel's performance deficient, the PCR judge held:

> Even if the jury is not entitled to an instruction that the defendant will receive a life sentence if they cannot reach a unanimous verdict of death, the jury is entitled to an instruction that the defendant's sentence becomes a matter of law to be imposed by the court if they cannot reach a unanimous verdict. During the *Allen*[19] charge by the judge in this case, the jury was informed that the verdict must be unanimous.  However, S.C. Code Ann. § 16-3-20 does not require the jury to reach a

---

[18] I agree with the majority that the appropriate relief here is a new sentencing proceeding, and that the PCR judge erred in sentencing Winkler to life.  *See* *Singleton v. State*, 313 S.C. 75, 437 S.E.2d 53 (1993).

[19] *Allen v. United States*, 164 U.S. 492 (1896).

unanimous verdict.  It only requires a unanimous jury verdict if
the death penalty is to be imposed.

As I read the order, the PCR judge held that this jury should have been instructed
that the result of their inability to reach a unanimous verdict would be to make the
sentence a legal issue to be decided by the judge.

In finding legal error here, the majority relies on *State v. Adams*, 277 S.C. 115, 283
S.E.2d 582 (1987) *overruled on other grounds by State v. Torrence*, 305 S.C. 45,
406 S.E.2d 315 (1991), and *State v. Copeland*, 278 S.C. 572, 300 S.E.2d 63 (1982)
as the state precedents.  Both of these older cases stand (if they continue to stand at
all) for the proposition that a capital sentencing jury need not be instructed before
beginning deliberations on the effect of a non-unanimous verdict.  The federal
precedent relied upon by the majority is a United States Supreme Court decision
deciding the same pre-deliberation issue under the Eighth Amendment.  *See Jones
v. United States*, 527 U.S. 373 (1999).  Here, of course, we are not dealing with a
pre-deliberation instruction request nor with an Eighth Amendment claim, but
rather with the question whether due process required this jury's mid-deliberation
questions be answered truthfully.  The majority acknowledges these three cases are
distinguishable, but states there are three reasons why "that difference does not
change our decision."  In my opinion, none of these three reasons creates an error
of law in the PCR judge's finding that trial counsel were deficient.

The first reason given by the majority is that in 1989, the Fourth Circuit
(interpreting Virginia law), held that "no obligation exists for the trial judge to
inform the jury of the ultimate result should they fail to reach a verdict."  *Evans v.
Thompson*, 881 F.2d 117 (4th Cir. 1989).  The *Evans* jury asked whether a life
sentence must be unanimous, and Evans asserted that his due process rights were
violated when the jury was instructed that their "verdict must be unanimous as to
either life imprisonment or death" rather than being instructed that "a split decision
. . . automatically becomes life . . . ."  *Id*. at 123.  Winkler's jury, however, did not
ask whether a life sentence must be unanimous but instead sent two notes.  The
first, sent after six hours of deliberation, read:

> Could you please explain what happens if we're not able to
> reach a unanimous decision?

The trial judge interpreted the question, without objection, "to be one of academic
interest" and answered with a note stating "I cannot answer the question the way
you have phrased it; if you have any questions let me know."  Two hours later, the

trial judge sent a note to the jury asking "do you have any questions or messages for the court?" The jury responded asking "What [does] the law state when a jury does not reach any unanimous decision at this stage of the trial?" The judge responded with this note: "I cannot answer hypothetical questions. Do you have any specific questions to ask or comments that you would like to make about your jury?"[20]

In my opinion, it is a stretch to equate the question asked by Evan's jury, whether a life sentence must be unanimous, with the questions asked by Winkler's jury, which was obviously struggling with the consequences if they are unable to return a unanimous verdict. In any case, it is even more of a stretch to say that Winkler's trial counsel were reasonable to rely on a Fourth Circuit case - of which there is no evidence they were aware - in deciding not to ask the trial judge to answer the jury's questions. Moreover, the PCR judge did not hold that trial counsel were deficient for failing to ask for an "automatic life" charge as in *Evans*, but rather held that a charge to the effect that the sentence would become a matter for the court should have been given. The issue before us is whether there is any evidence to support the PCR judge's finding that reasonable counsel would have asked for an instruction, not whether we can find a twenty-five year old federal case interpreting the law of a different jurisdiction that would arguably support their decision not to make such a request. *Roberts*, *supra*.

In my opinion, none of the cases relied upon by the majority are precedents that excuse a reasonable advocate operating under prevailing professional norms from requesting that this jury's repeated questions be answered. *Wiggins v. Smith*, 539 U.S. 510 (2003) (ineffectiveness standard in death penalty sentencing PCRs). Instead, Winkler's trial attorneys allowed his jury to be told their questions were merely "hypothetical," non-specific, and not capable of being answered.

The majority's second reason why this case is different is, to me, the most concerning. The majority holds the difference here is that unlike the three cases which it cites, the present case is not a direct appeal. Were it in this procedural posture, we would answer the question whether, under the facts and circumstances of this case, the jury's inquiries should have been answered. Instead, since this is

---

[20] The jury subsequently sent a note saying they were struggling to reach a unanimous decision, and were given their first *Allen* charge at 12:26 am, more than twelve hours after they began deliberations. The jury left without continuing deliberations and returned at 9:15 am the next day, requested they rehear the *Allen* charge, and following that exited the courtroom, returning a verdict at 10:14 am.

"only" a PCR, the question is not whether the capital defendant's due process rights were violated, but instead merely whether his trial counsel acted reasonably. As explained below, I cannot countenance what I see as the Court's continued devaluation of the constitutional rights of capital defendants. In 1991, a majority of the Court abolished the doctrine of *in favorem vitae* which had required the Court to search the record in a capital appeal for legal error. *State v. Torrence*, *supra*. The majority of the Court justified the abolition of this common law doctrine in large part because of the protections afforded capital defendants by the Uniform Post-Conviction Procedure Act. That PCR is a poor substitute for *in favorem* review, however, was made explicit in *Franklin v. Catoe*, 346 S.C. 563, 552 S.E.2d 718 (2001). In *Franklin*, the capital PCR applicant contended trial counsel were ineffective in failing to inform him of his statutory right to argue to the jury in the guilt phase of his trial. The *Franklin* majority acknowledged that the applicant had been denied this statutory right, and that prior to the abolition of *in favorem*, this error would have warranted a new trial. The *Franklin* majority held, however, that with PCR "replacing" *in favorem* review, a capital defendant now bore the burden of proving not only error, but also constitutional prejudice. Today, with its second reason, the majority highlights the unfulfilled promise of *Torrence*. I cannot agree that we should afford less protection to capital defendants who are forced to litigate claims of constitutional deprivation in PCR than to those whose trial counsel preserve these issues for direct appeal.

The third reason advanced why the PCR judge's ruling must be reversed is that "there is little possibility that answering [this] jury's question[s] could assist the jury in deliberations." I cannot agree that this jury would not have been aided in its deliberations had it been told that the law would resolve the sentencing issue if it were unable to reach a unanimous decision. Further, this third reason seems to me a "difference" directed not at the question whether counsel were deficient, but rather whether Winkler was prejudiced by the non-answers given to his jury. Finally, I find unpersuasive the majority's stated concerns that answering this jury's questions might have diverted a juror from her duty to deliberate, or caused her to realize her ability to control the situation by refusing to do so. The issue before us is not whether jury's should be given a pre-deliberation charge on the effect of their failure to reach a sentencing verdict but whether jurors who repeatedly raise questions should be told the truth. In my opinion, the majority's concerns reflect a lack of faith in our jurors, and in the jury system as a whole.

Turning back to the question of deficient performance, in *Simmons v. South Carolina*, 512 U.S. 154 (1994), the United States Supreme Court held the capital defendant's due process rights were violated when his jury's question regarding

parole eligibility was not answered, leaving them to reasonably believe he would be released on parole if not executed. Here, the failure to answer this jury's questions reasonably led them to believe either (1) that they had no option but to return a unanimous verdict of life or death, thereby coercing them, or (2) that the consequence of a failure to agree on one of these two choices would result in an entirely different sentence, that is, a term of years or probation, leaving Winkler in a similar situation to Simmons. What other conclusions could the jury draw from being told that their inquiries as to what would happen should they not reach a unanimous verdict was merely "hypothetical," and not capable of being answered? While *Simmons* may not decide the exact due process issue raised by the facts of this case, I find a reasonable death-qualified attorney operating under prevailing professional norms would have seen the analogy, and used *Simmons* to argue for the judge to truthfully answer this jury's questions. Therefore, in my opinion, there is evidence to support the PCR judge's **factual finding** that counsel were deficient here. *Roberts*, *supra*.

It troubles me greatly that the majority uses cases that, by its own candid admission, are "different" to excuse counsels' failure to ask that the jury's questions be answered. This is especially so in a capital case where both the legislature and this Court have recognized the need for specially qualified trial counsel for indigent defendants such as Winkler.[21] The prevailing professional norms of these specialized practitioners require they recognize, litigate, and preserve for appeal novel issues, be aware of current capital jurisprudence, and challenge precedents either directly or through analogy.[22]

In my opinion, we must uphold the PCR judge's factual findings that trial counsel were deficient in failing to ask for jury instructions that addressed the jury's questions, that as a result Winkler's due process rights were violated, and his legal conclusion that Winkler was prejudiced. *Roberts*, *supra*.

Winkler's jury's recommendation of death was not the result of measured deliberation, but rather the product of significant jury preoccupation and confusion

---

[21] *See* S.C. Code Ann. § 16-3-26(B)(1); (F) (2016); Rule 421, SCACR; *see also* Guideline 8.1, ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (2003); *State v. Barnes*, 407 S.C. 27, 753 S.E.2d 545 (2014) (dissent discusses need for specially qualified capital trial attorneys to help address the "heightened reliability" requirement of capital sentencing).

[22] *Cf.*, "[T]he law is not always clear and never is static." Commt. 1 to Rule 3.1, Rule 407, SCACR.

with what would occur should they not reach a unanimous verdict, compounded by the court's refusal to treat its questions as valid.  Accordingly, in my opinion, Winkler is entitled to a new sentencing hearing even if he does not otherwise establish his entitlement to this relief on remand on his claim of ineffective assistance for failing to present evidence of neurological and cognitive impairment.


**BEATTY, J., concurs.**